[S. F. No. 11173. In Bank.—December 31, 1924.]

JAMES GARVIN, Respondent, v. J. F. CHAMBERS et al., Members of the Civil Service Board of the City of Oakland, Appellants.

[1] MUNICIPAL CORPORATIONS — CIVIL SERVICE — COMPLAINT AGAINST POLICEMAN—OAKLAND CHARTER—PROCEDURE.—The city charter of Oakland does not provide in terms for the filing of a formal complaint against a member of the police department for any dereliction of duty, but it was the intent of the charter to provide and permit that the original order of discharge would suffice

---

1. See 22 R. C. L. 572–576; 18 Cal. Jur. 963; 21 Cal. Jur. 982.

in lieu of a formal complaint filed with the civil service board and that the hearing of the appeal before that board would be in the nature of a trial based upon the order of discharge.

[2] ID.—PROCEEDINGS BEFORE CIVIL SERVICE BOARD—NATURE OF.—The proceedings provided for by the Oakland charter for the trial of a policeman for dereliction of duty before the civil service board upon an appeal from an order of discharge clearly are not ministeral and undoubtedly are *quasi* judicial in character.

[3] CERTIORARI—REVIEW OF PROCEEDINGS OF INFERIOR BOARD OR TRIBUNAL—JURISDICTION.—The writ of *certiorari,* where the right of appeal is not given, tries only the jurisdiction of an inferior board or tribunal exercising judicial functions.

[4] ID. — REVIEW OF EVIDENCE BY COURTS — SOLE PURPOSE TO DETERMINE JURISDICTION.—The evidence adduced upon the hearing before an inferior board or tribunal having limited jurisdiction may be brought up to a reviewing court upon *certiorari* for the sole purpose of determining whether or not, from the evidence before it, the finding of a jurisdictional fact by such inferior board or tribunal is sustainable, and if there be no evidence to sustain such decision, it must be annulled.

[5] ID.—TRIAL OF POLICEMAN — OAKLAND CHARTER — NATURE OF PROCEEDING.—The charter of Oakland contains no provision making the findings of the civil service board on the trial of a policeman charged with dereliction of duty final and conclusive nor is there anything in the charter provisions which would indicate that the hearing which must be accorded to a suspended police officer is in the nature of a summary proceeding; on the contrary, the charter contemplates a full and fair hearing and the board is acting in a *quasi*-judicial capacity on the hearing.

[6] ID.—JURISDICTION—CHARACTER OF OFFENSE—RIGHT TO OBJECT TO JURISDICTION.—Jurisdiction of an offense is not marked and measured by a mere compliance with the procedure provided for the prosecution of the offense, but in addition consideration must be given to the question of whether or not the character of the offense charged comes within the category of offenses defined and denounced by the law, and the fact that the authority of the civil service board had been invoked by the taking of an appeal on a charge against a policeman for dereliction of duty would not deprive the latter of the right to attack the final action of the board as transcending its powers.

[7] ID. — FINDINGS OF TRIAL COURT — SUFFICIENCY OF RECORD TO SUSTAIN.—In this proceeding in *certiorari* it is held that the record

2.  See 21 Cal. Jur. 985.
3.  See 5 R. C. L. 250.

returned for review in response to the writ fully supports the finding of the trial court.

[8] ID.— JURISDICTION OF CIVIL SERVICE BOARD — PRESUMPTIONS.— The jurisdiction of the civil service board under the Oakland charter is special and limited to the determination of the correctness of the order of discharge of a policeman appealing to it, and no legal presumptions or intendments may be indulged to uphold its order. Facts must appear on the face of the record sufficient to sustain a finding that the petitioner was guilty as charged, otherwise the order of the board sustaining the discharge was in excess of the power conferred upon it, without the limits of its special jurisdiction and not in the regular pursuit of its authority as contemplated by sections 1068 and 1074 of the Code of Civil Procedure.

[9] ID. — OAKLAND CHARTER — DISCHARGE OF POLICEMEN — GROUNDS. Under the charter of Oakland police officers may not be discharged for no reason at all or for any reason except "misconduct, incompetency or failure to perform their duties under or observe the rules and regulations of the department or office."

[10] ID. — DISCHARGE OF POLICEMAN — CHARGE OF NEGLECT OF DUTY. Where a policeman has been discharged he is not thereafter a member of the police department and consequently could not, pending a revocation of the order of discharge, be held amenable to a charge of neglect of duty, or for a refusal to comply with a command which did not concern the performance of police duty.

[11] ID.—RIGHTS TO PUBLIC OFFICE—REMOVAL.—Even though it be conceded that a right to public office is not a vested property right, state and municipal employees holding office under civil service rules and regulations are entitled as a matter of right to have such rules and regulations relative to their removal from office fairly invoked and applied.

[12] ID.—SUSPENSION OF POLICEMAN—CHARGE OF VIOLATION OF PROHIBITION LAW—APPEAL—NATURE OF PROCEEDING.—An appeal by a policeman under the Oakland charter to the civil service board from an order of suspension following the institution against him of a charge in the federal court of violating the prohibition law is a proceeding *quasi* criminal in its nature, and the safeguards which are ordinarily provided and invoked to protect reputation and rights in courts of justice should in substance be observed in such proceedings.

[13] ID. — REFUSAL TO TESTIFY AGAINST SELF. — The refusal of the policeman to be, in effect, a witness against himself in such proceeding cannot be held to be a violation of the rules of the

11.   See 21 Cal. Jur. 978.

department nor of the charter provisions under which the department is operating, and could not form a foundation of jurisdiction for an order of dismissal from the department.

---

(1) 28 Cyc., p. 518 (Anno.).   (2) 28 Cyc., p. 518 (Anno.).   (3) 11 C. J., p. 195, sec. 346.   (4) 11 C. J., p. 205, sec. 367.   (5) 28 Cyc., p. 581 (Anno.).   (6) 28 Cyc., p. 518 (Anno.).   (7) 28 Cyc., p. 519. (8) 28 Cyc., p. 518 (Anno.).   (9) 28 Cyc., p. 509.   (10) 28 Cyc., pp. 509, 510.   (11) 28 Cyc., p. 593; 36 Cyc., p. 862.   (12) 28 Cyc., p. 518 (Anno.).   (13) 28 Cyc., p. 509.

APPEAL from a judgment of the Superior Court of Alameda County. James G. Quinn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Leon E. Gray, City Attorney, and Markell C. Baer, Assistant City Attorney, for Appellants.

Frank M. Carr and Stanley R. Sterne for Respondent.

Grover O'Connor, Attorney for San Francisco Municipal Civil Service Association, *Amicus Curiae.*

LENNON, J.—This is an appeal by the defendant, the civil service board of the city of Oakland, from a judgment of the superior court, in and for the county of Alameda, annulling upon *certiorari* an order of the defendant board finding the petitioner, a police officer, guilty of insubordination and sustaining an order of the commissioner of public health and safety dismissing him from the police department of the city of Oakland.

The charter of the city of Oakland provides that "All persons holding positions in the classified civil service shall be subject to suspension, fine and also to removal from office or employment, by the commissioner in whose department they are employed . . . for misconduct, incompetency or failure to perform their duties under or observe the rules and regulations of the department or office; but subject to the appeal of the aggrieved party to the civil service board as herein provided. . . . Any person suspended, fined or discharged . . . may within five days from the making by a commissioner . . . of the order . . . discharging him, . . . appeal therefrom to the civil service board, which shall fully

hear and determine the matter. The accused shall be entitled to appear personally, and to have counsel and a public hearing. The finding and decision of the board shall be certified to the official from whose order the appeal is taken, and shall forthwith be enforced and followed by him." (Secs. 81 and 82, Charter of the City of Oakland, Stats. 1911, pp. 1605, 1606.)

In keeping with these provisions of the charter, Frank Colburn, commissioner of public health and safety of the city of Oakland, made to the defendant board the following report, dated April 4, 1922:

"Garvin, James A.; . . . Patrolman, O. P. D.; discharged for violation of Sec. 81 of City Charter, to wit: willful disobedience of orders; also for violation of Section 348 of the Rules & Regulations of Police Dept., to-wit: conduct subversive of good order and the discipline of the Dept."

[1] The city charter of Oakland does not provide in terms for the filing of a formal complaint against a member of the police department for any dereliction of duty but, obviously, it was the intent of the charter to provide and permit that the original order of discharge, such as was made in the instant case, would suffice in lieu of a formal complaint filed with the civil service board and that the hearing of the appeal before that board would be in the nature of a trial based upon the order of discharge.

[2] The proceedings provided for before the defendant civil service board upon an appeal from an order of discharge clearly are not ministerial and undoubtedly are *quasi* judicial in character. This is indicated by that provision of section 82 of the charter which directs that the civil service board shall "fully hear and determine the matter." That the proceedings before the board were intended to be in the nature of an original trial, with the order of discharge as a complaint, is sufficiently indicated by that provision of the charter section which provides that "the accused shall be entitled to appear personally and to have counsel and a public hearing." And that the determination of the board is in the nature of an original and final judgment is indicated by that provision of the same section of the charter which requires that the board shall make its "finding and decision" and certify the same to the official who made the order in the first instance.

Within the time provided by the charter, the petitioner, Garvin, appealed to the defendant civil service board of the city of Oakland from the said order discharging him from the position of patrolman in the police department. On April 18, 1922, the matter came on for hearing before the civil service board. Witnesses were sworn on behalf of the commissioner of public health and safety, the official who had made the charge against Garvin, and upon that hearing Garvin was sworn and testified as a witness in his own behalf. Whereupon, so the return shows, "The board, after hearing the testimony and arguments in the case, finds as follows: That the appellant, James A. Garvin, is guilty of (1) willful disobedience of orders; (2) conduct subversive of good order and discipline of the department; as charged by the Commissioner of Public Health and Safety." The board thereupon made an order denying the appeal and directing that its finding and decision be certified to the commissioner of public health and safety.

The evidence taken upon the hearing of the appeal before the board reveals, as appears from the record returned to the court below in response to the writ, the following facts:

At the time of Garvin's dismissal he had been a patrolman of the Oakland police department for over nine years. Shortly prior to his dismissal from the force he was accused of violating the National Prohibition Act and thereupon was by Frank Colburn, commissioner of public health and safety, "indefinitely suspended without pay, from position as Patrolman, pending investigation for misconduct, viz.: For alleged violation of the National Prohibition Act." From that order of suspension Garvin appealed to the civil service board and a hearing on the order of suspension was set for April 4, 1922, at 8 P. M. Garvin had retained an attorney to represent him upon that appeal before the defendant board.

Late in the afternoon of April 3, 1922, while the order of suspension was still in force and while the appeal therefrom was still pending, Garvin was called to the phone by a Mr. Tracy, assistant police inspector, acting under the direction of the chief of police, who requested Garvin to come to the office of the chief of police on the following morning. Garvin at that time promised to call upon the chief as requested, but his attorney, who was engaged in other matters and unable to go with him, advised Garvin

that while he was suspended and until he had been re-instated he should have no conversation with anybody in the police department with reference to the matter upon which he had been suspended unless he (the attorney) was also present. About noon of April 4th, Garvin was again called to the phone by a Mr. Meegan, senior stenographer for the chief of police, and requested to call at the chief's office. Garvin refused. Whereupon the chief of police in person talked to him over the phone and was told by Garvin in substance that he would not talk with him concerning the suspension unless his lawyer was present. Shortly there-after the chief of police got Garvin on the phone again and Garvin promised to call on the chief about 3 o'clock, at which hour he appeared with his attorney at the office of the chief. When Garvin called at the office with his attorney he was told by Mr. Meegan, the official stenographer, who was ready with his note-book and pencil in hand to take down the conversation between the chief and Garvin, that the chief desired to see him alone. Garvin said that he wanted his attorney to come in with him. The chief over-heard Garvin, the door being open between the anteroom and the chief's private office, and said, as Garvin stepped into the private office, "You are still a member of the department until you are discharged, are you not?" to which Garvin replied, "Yes, but I want my attorney to come and hear what is being said," or words to that effect. The chief demanded of Garvin, "Are you taking orders from me as chief of police or from your attorney?" and Garvin replied, "I am taking my own orders right now." The chief there-upon peremptorily demanded of Garvin whether he was or was not coming in. Garvin replied, "I am coming in if my attorney is coming in, and if he is not coming in, I am not coming in." Thereupon he and his attorney left the room. It is to be noted that the record shows "there was no boisterousness about Mr. Garvin's conduct on that occasion," and that he did not "talk in a loud or unusual voice." There was "no disturbance."

Prior to April 4, 1922, on which day Garvin's appeal from the order of suspension was to be heard, the charge made against him of violating the National Prohibition Act was dismissed by the federal authorities. The chief of police and the commissioner of public health and safety having

knowledge of this fact had a conference prior to the chief's calling Garvin on the phone concerning the propriety of removing Garvin's suspension and restoring him to duty in the department. The result of that conference, so Commissioner Colburn testified at the hearing before the civil service board, was that if ''Garvin could not satisfy the Chief, then whether or not he would be restored would be something that would be taken up again,'' and Commissioner Colburn ''gave the Chief to understand that he [Garvin] would be reinstated providing . . . Garvin could satisfactorily explain his relationship regarding the charge.'' Commissioner Colburn further testified at the hearing before the civil service board that ''if the Chief was not satisfied all around'' the commissioner believed that he would have weighed that circumstance against Garvin and ''then possibly discharged him.'' The commissioner would not, if the chief were not satisfied, have proceeded with the hearing of the charge upon which the suspension had been based, but ''would have gone further than that . . . would have proceeded with the kind of a hearing'' that was being had by the civil service board. Garvin, at the time he was called to the phone and at the time he called at the chief's office, was not informed by the chief or anyone else that the question of lifting his suspension was under consideration nor has he ever since then been officially notified that the suspension had been lifted and that he had been restored to duty in the department.

The chief of police immediately upon Garvin's leaving the office made a report, based upon the notes taken by his shorthand reporter, to Colburn, commissioner of public health and safety, ''recommending the dismissal of officer Garvin for disobedience of orders, that is a violation of section 81 of the city charter and also for violation of rule 348, a portion of it, conduct unbecoming—conduct adverse to good order and discipline of the department.'' Shortly thereafter, and prior to the time set for the hearing by the civil service board of the order of suspension, an order was made and signed by the commissioner of public health and safety revoking the order for Garvin's suspension and restoring him to his position as patrolman in the police department and, simultaneously, another order, the one in question here, was

made and signed by Colburn, dismissing Garvin from the service of the department.

Save for minor and inconsequential details the foregoing is, in substance, a statement of all the testimony which was taken upon the hearing before the civil service board.

The crux of the contention made by the defendant board in opposition to the writ is that the function of a writ of *certiorari* is limited solely to a determination of the question of whether or not the board or tribunal whose action is sought to be annulled had jurisdiction of the subject matter and that, therefore, the scope of the inquiry upon *certiorari* is limited to a determination of whether or not the subject matter of the appeal was within the jurisdiction of the board. In this behalf it is argued by defendant board that, even though there be *an entire absence of any evidence* to support the finding and decision of the inferior tribunal, the determination of the tribunal is only an erroneous decision "within the jurisdiction of the tribunal" and cannot be disturbed on *certiorari.*

Petitioner, in support of the writ, contends that where the decision of an inferior *quasi*-judicial board or tribunal of limited jurisdiction rests upon no evidence at all, such decision may be properly reviewed and annulled on *certiorari.* It is the petitioner's contention in the instant case that there was no evidence introduced before the board in support of its order discharging him from the department.

[3] There can be no doubt but that the writ of *certiorari,* where the right of appeal is not given, tries only the jurisdiction of an inferior board or tribunal exercising judicial functions. (Sec. 1074, Code Civ. Proc.) The general rule that the evidence will not be reviewed on *certiorari* is not applicable to the instant case. The general rule and the exception thereto are pointed out in *Roberts* v. *Police Court,* 185 Cal. 65 [195 Pac. 1053], and the instant case comes, we think, under the exception to the general rule. The defendant board in the instant case is an inferior board or tribunal of limited jurisdiction exercising judicial functions. Its jurisdiction is limited to the determination of those questions which it is authorized to decide under the provisions of the charter of the city of Oakland. In other words, it has jurisdiction to proceed only when facts appear in a proceeding before it which show that it has jurisdiction. Where

there is a conflict in the evidence or where the decision of such inferior board or tribunal of limited jurisdiction is supported by some evidence the decision of such board or tribunal cannot be reviewed on *certiorari.* But when the board or tribunal in question has power to act only upon the establishment of a certain set of facts which necessarily form the foundation of jurisdiction and, therefore, may be denominated jurisdictional facts and there is no evidence whatever to show the existence of such facts, a finding by such board or tribunal that those facts do exist cannot foreclose inquiry by a court of competent jurisdiction, upon *certiorari,* as to whether or not the order sought to be reviewed is without any evidence to support it or is absolutely contrary to the uncontradicted and unconflicting evidence upon which it purports to rest.

[4] It is a fair summary of the decisions of this state, dealing with the scope of statutory *certiorari,* to say that the evidence adduced upon the hearing before an inferior board or tribunal having limited jurisdiction may be brought up to the reviewing court upon *certiorari* for the sole purpose of determining whether or not, from the evidence before it, the finding of a jurisdictional fact by such inferior board or tribunal is sustainable, and if there be no evidence to sustain such decision it must be annulled. (*Thrasher* v. *Board of Medical Examiners,* 44 Cal. App. 26 [185 Pac. 1006]; *Bryant* v. *Board of Supervisors,* 32 Cal. App. 495 [163 Pac. 341]; *Stumpf* v. *Board of Supervisors,* 131 Cal. 364 [82 Am. St. Rep. 350, 63 Pac. 663]; *Borchard* v. *Board of Supervisors,* 144 Cal. 10 [77 Pac. 708]; *Englebretson* v. *Industrial Acc. Com.,* 170 Cal. 793 [151 Pac. 421]; *Great Western Power Co.* v. *Pillsbury,* 170 Cal. 180 [149 Pac. 35].)

The case of *Boyd* v. *Pendegast,* 57 Cal. App. 504 [207 Pac. 713], is not inconsistent with anything here said concerning the right to review upon *certiorari* the question as to whether or not the findings of the defendant board, in the absence of a conflict in the evidence as to the existence of a jurisdictional fact, is contrary to the facts developed upon the hearing before the board. The case cited had to deal with the provisions of the charter of the city of Los Angeles which provided, in substance, that where a police officer has been suspended by the chief of police the officer might, upon request, be accorded a hearing before the board of police com-

missioners, but that the manner in which the hearing should be conducted and the character of the evidence to be received rested solely within the discretion of the commission; and that when such a hearing has been had, then, by the express language of the charter, the "order of said board with respect to such suspension or removal shall be final and conclusive." Evidently the charter of the city of Los Angeles contemplated no more than a mere summary hearing and the court held that the charter provision making the findings of the police commissioner final and conclusive meant that "such findings must be accepted regardless of any defect or deficiency in the evidence" and that "when such a hearing has been had the decision, by the very terms of the charter, is placed beyond the reach of any review by the courts." The situation presented here is decidedly different. [5] The charter of the city of Oakland contains no provision making the findings of the board final and conclusive, nor is there anything in the charter provisions which would indicate that the hearing which must be accorded to a suspended police officer is in the nature of a summary proceeding. To the contrary, that charter provides that upon an appeal from a removal or suspension from office the defendant board "shall fully hear and determine the matter. The accused shall be entitled to appear personally and have counsel and a public hearing." Obviously, the provisions of the Oakland charter contemplate and call for a full and a fair hearing, which is no more nor less than a trial upon the charge preferred against the accused officer, and there can be no doubt but that upon the hearing of the charge the defendant board is acting in a *quasi*-judicial capacity.

[6] Jurisdiction of an offense is not marked and measured by a mere compliance with the procedure provided for the prosecution of the offense, but in addition consideration must be given to the question of whether or not the character of the offense charged comes within the category of offenses defined and denounced by the law, and the fact that the authority of the board had been invoked by the taking of the appeal would not deprive the petitioner of the right to attack the final action of the board as transcending its powers. (*Long* v. *Superior Court*, 102 Cal. 449 [36 Pac. 807] ; *Smith* v. *Westerfield*, 88 Cal. 374 [26 Pac. 206] ; 7 Cal. Jur. 579; *Green* v. *Superior Court*, 78 Cal. 556 [21 Pac. 307, 541].)

[7]    The trial court in the instant case found that "there was no evidence adduced before said civil service board showing or tending to show that the petitioner, James Garvin, had ever been guilty of willful disobedience of orders, or of any order, or showing or tending to show that the said James Garvin had ever been guilty of conduct subversive of good order and discipline of the department, and that the said civil service board, in denying the appeal of the said James Garvin from the said order discharging him and in sustaining the order of said commissioner of public health and safety, exceeded its jurisdiction and did not regularly pursue its authority." The record returned for review in response to the writ we think fully supports the finding of the trial court.

[8]    The jurisdiction of the civil service board, as previously indicated, is special and limited by the charter of the city of Oakland to the determination of the correctness of the order of discharge of the petitioner. The power of the board being special and limited, no legal presumptions or intendments may be indulged to uphold its order. (*Petersen v. Civil Service Board,* 67 Cal. App. 70 [227 Pac. 238].) Facts must appear on the face of the record sufficient to sustain a finding that the petitioner was guilty as charged, otherwise the order of the defendant board sustaining the discharge was in excess of the power conferred upon the board, without the limits of its special jurisdiction and not in the regular pursuit of its authority as contemplated by sections 1068 and 1074 of the Code of Civil Procedure.

[9]    Under the charter of the city of Oakland police officers may not be discharged for no reason at all or for any reason except "misconduct, incompetency or failure to perform their duties under or observe the rules and regulations of the department or office." (Section 81 of the Charter of the City of Oakland, Stats. 1911, p. 1605.)

The facts presented to the board upon appeal will not suffice as the basis for its order sustaining the discharge. The charge made against the petitioner, Garvin, was tantamount to a charge of insubordination, which, under the provisions of the charter, was cognizable by the defendant board, and, under the doctrine of the authorities hereinbefore cited and discussed, was subject to review by *certiorari* to

the extent of ascertaining whether or not the admitted facts which form the basis of the charge amounted to insubordination in contemplation of law, and therefore constituted a cause of removal.

[10] The finding in effect of the defendant board that the petitioner, Garvin, was guilty of insubordination was plainly predicated upon Garvin's refusal, while under an indefinite order of suspension, to be interrogated by the chief of police concerning his alleged complicity in a violation of the federal prohibition law.

It has been held, and, we think, correctly, that where a policeman has been discharged he is not thereafter a member of the police department and consequently could not, pending a revocation of the order of discharge, be held amenable to a charge of neglect of duty, and this was held to be so upon the theory that the discharge of the officer deprived him of his office and rendered him exempt from and ineligible for police duty. (*People* v. *Board,* 39 N. Y. 506.)

In the case of *Carey* v. *Plainfield,* 53 N. J. L. 311 [21 Atl. 492], it was held that suspension of a policeman from office for a specified term deprived him of his office, and that during the term for which he was suspended he did not hold the office, because such suspension was a discharge, *pro tanto,* from office.

Insubordination can be rightfully predicated only upon a refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed. In the instant case, while the order of indefinite suspension was in force Garvin's status as a policeman was suspended to the extent that he could not be called upon to do police duty nor be held amenable for a failure to do such duty. And that being so, it follows, for obviously greater reasons, that he could not be held amenable for a refusal to comply with a command which concerned not the performance of police duty, but which, under the undisputed evidence, clearly contemplated "putting him on the carpet" concerning the charge previously instituted against him and for which he was under suspension.

While it is true the evidence shows that it had been tentatively agreed between the chief and Commissioner Colburn that the order of suspension was to be revoked on the evening of the day that the chief called Garvin to the office,

nevertheless, it is an admitted fact in the case that Garvin was in entire ignorance of this fact, and this, doubtless, was the reason for his refusal to be interviewed in the presence of a stenographer without the presence of his attorney. It was but natural that Garvin should deal at arm's-length with the chief, who, during the period of suspension, was acting not as Garvin's superior officer but as his prosecutor.

That it was the intention of the chief of police, when seeking an interview with Garvin, to institute an inquisitorial proceeding against him, in advance of and in lieu of the hearing which was to be had upon the appeal before the defendant board, is evidenced by the fact that Commissioner Colburn "gave the chief to understand that he [Garvin] would be reinstated provided Mr. Garvin could satisfactorily explain his relationship regarding the charge."

[11] Even though it be conceded that a right to public office is not a vested property right, nevertheless state and municipal employees holding office under civil service rules and regulations are entitled as a matter of right to have such rules and regulations relative to their removal from office fairly invoked and applied.

If the hearing upon the appeal of Garvin could be summarily transferred from the defendant board to the chief of police, then indeed would it be an easy matter to circumvent the rules and regulations governing civil service by charging an officer with an offense and pending the hearing inveigle him into apparent disobedience of orders by demanding that he discuss the details of the case pending against him, and, upon his refusal to do so, discharge him for insubordination.

[12] Garvin's first appeal, which was from the order of suspension following the institution against him of the charge in the federal court, was a proceeding *quasi* criminal in its nature. It involved in a sense the right to office and put at stake Garvin's good name as well. The safeguards which are ordinarily provided and invoked to protect reputation and rights in courts of justice should in substance be observed in proceedings of the character here under consideration. (*People* v. *Elmendorf*, 42 App. Div. 306 [59 N. Y. Supp. 115].)

[13] We think that the refusal of Garvin to be, in effect, a witness against himself cannot be held to be violation of the

rules of the department nor of the charter provisions under which the department is operating and consequently could not form a foundation of jurisdiction for the order of dismissal from the department. *Certiorari* will, therefore, intervene to annul the order of discharge upon the distinct ground that the defendant board was without jurisdiction to adjudge Garvin's conduct to be insubordination when it is plainly apparent, under all of the admitted facts, that such conduct did not and could not constitute insubordination in contemplation of law. (*In re Shortridge*, 99 Cal. 526 [37 Am. St. Rep. 78, 21 L. R. A. 755, 34 Pac. 227].)

The judgment is affirmed without costs.

Lawlor, J., Richards, J., and Shenk, J., concurred.

SEAWELL, J.—I dissent.

The order of the civil service board denying petitioner's appeal and sustaining the order of discharge made by the commissioner was final, as I read the charter, and was not subject to annulment by the superior court on the ground that said order was not sufficiently supported by the evidence upon which the board based its said order sustaining the dismissal of petitioner from the position of a patrolman. Conceding, for the instant, that the superior court had jurisdiction to annul the order of the board on the ground of insufficiency of the evidence, the rule is that if there is any evidence of a substantial character from which an inference may fairly be drawn which would support said order of dismissal such order cannot be interfered with by a reviewing body. Certainly it cannot be claimed that the record in this case presents a state of facts so overmastering in petitioner's favor as to absolutely exclude an inference that petitioner's conduct and manner did not amount to insubordination or conduct subversive of the good order and discipline of the department.

The power of the city of Oakland to solve for itself questions affecting its civic welfare is expressly granted by charter, and in determining the scope of this power we are bound by the language of the charter, and we have no right to limit its scope or to go beyond the authority expressly granted. In this respect the charter is supreme. (*Sunter* v. *Fraser*, 194 Cal. 337 [228 Pac. 660].)

Section 81 of the Charter of the City of Oakland provides:

"All persons holding positions in the classified civil service shall be subject to suspension, fine and also to removal from office or employment, by the Commissioner in whose Department they are employed, . . . but *subject to the appeal* of the aggrieved party to the Civil Service Board as herein provided. (Italics ours.)

"Any chief official, any subordinate officer, and any superintendent or foreman in charge of municipal work may temporarily suspend any subordinate then under his direction for incompetency, neglect of duty or disobedience of orders, but shall within twenty-four hours thereafter report the facts in writing to the Commissioner of his Department or to the Auditor, as the case may be, and furnish a copy of the report to the subordinate suspended, upon his request therefor. The Commissioner (or auditor) shall thereupon, if demanded by the subordinate suspended, hear evidence for and against him, and shall thereupon affirm or revoke such suspension, according as he finds the facts to warrant."

Section 82 provides:

"Any persons suspended, fined or discharged (and any person whose order of suspension above provided for has been revoked) may within five days from the making by a Commissioner (or the Auditor) of the order suspending, fining or discharging him, or affirming or revoking an order of suspension, as the case may be, appeal therefrom to the Civil Service Board, which shall fully hear and determine the matter. The accused shall be entitled to appear personally, and to have counsel and a public hearing. The finding and decision of the Board shall be certified to the official from whose order the appeal is taken, *and shall forthwith be enforced and followed by him.*" (Italics ours.)

From the foregoing sections it seems perfectly clear that the city adopted a complete scheme for the management of its municipal affairs and in so doing took the pains to place the matter of the employment and discharge of its employees beyond the control, supervision, and interference of courts in cases where no breach of contractual obligation is involved. The charter explicitly provides that the chief official of any department may suspend any subordinate under him on any

of the grounds named in section 81 and report his action to the commissioner of his department. Said commissioner, if demanded by the suspended subordinate, shall hear evidence for and against said suspended subordinate and shall revoke or affirm such suspension according as he finds the facts to warrant. Any suspended or discharged subordinate has the right to appeal from an order of affirmance made by the commissioner to the civil service board within five days thereafter, which appeal shall be fully heard and determined by the board. Unless an appeal is taken the commissioner's order is final. It is plain from a reading of sections 81 and 82 that the procedure thereby adopted was intended to be exclusive and conclusive of the controversy. The chief of any department may suspend any subordinate under his direction as above pointed out. The employee or officer suspended may demand of the commissioner of the department to which he is annexed that he hear the evidence in the matter and revoke the suspension if it is found to have been improperly made. If the commissioner finds against the suspended officer the latter may take an appeal to the civil service board within the time fixed by the charter. The deposed officer is entitled to appear by counsel at a public investigation to be held by the civil service board, which body "shall *fully hear and determine* the matter. . . . The finding and decision of the board shall be certified to the official from whose order the appeal is taken and shall forthwith be enforced and followed by him." (Sec. 82, City Charter.) Thus it will be seen that a progressive procedure which terminates in an appeal to the civil service board has been adopted. The action of the commissioner affirming or revoking a suspension or dismissal made by the chief officer of a department may be finally reviewed by the method provided by the charter which is reviewable only upon an appeal to the Civil Service Commission. Such, unquestionably, is the effect of the charter language of the municipal government. As a matter of fact, the action of the chief officer, which is final unless appealed from at the discretion of the discharged employee, is subject to examination and review by two departments of government. The intent of the charter language, considered with reference to the purpose to be attained, to wit, expedition and efficiency in the manage-

ment of municipal affairs without the delay of legal proceedings, is too apparent to admit of serious doubt. Had the Oakland charter contained the clause "the order of said board with respect to such supervision or removal shall be final and conclusive," as did the Los Angeles charter (*Boyd* v. *Pendegast,* 57 Cal. App. 504 [207 Pac. 713]), the intent of the charter would have scarcely been more emphatically expressed than by what appears from the context of the section taken as a whole. The growing tendency of courts is to recognize as final the orders and findings of civil service boards, city councils, boards of supervisors, and other inferior bodies which are charged with the administration of governmental affairs if the intent so to do is fairly inferable from the context of the instrument granting administrative control, even though there be no express mandate to that effect. Nothing was said in *Boyd* v. *Pendegast, supra,* inconsistent with this rule of construction which we think must be inevitably recognized. If the language of the charter is given the meaning which it seems must inevitably be given to it, the Boyd case becomes an authority in support of the finality of the board's order.

No legal distinction exists between the questions raised here and those passed upon in *Price* v. *City of Seattle et al.,* 39 Wash. 376 [81 Pac. 847]. The charter provisions of the city of Seattle and the city of Oakland are strikingly similar in important essentials. The plaintiff in the case last above cited was a driver employed in the street department of the city of Seattle in the classified civil service. He was removed by the city superintendent of streets for insubordination and neglect and refusal to perform his duty. The superintendent filed with the Civil Service Commission a statement in writing giving his reasons for the removal, as required by the city charter. Within ten days thereafter the plaintiff demanded an investigation by the Civil Service Commission. Upon the conclusion of the investigation the commission certified its finding and decision to the appointing officer confirming his action in directing the removal. Action was brought against the city and the Civil Service Commission for a mandatory injunction to reinstate the plaintiff in his former office. Plaintiff had judgment in the court below and the cause was reversed on appeal, Hon-

orable Frank H. Rudkin, then a justice of the supreme court
of Washington, writing the opinion.   Charter provisions are set
out in the opinion which are reproduced at some length, first,
to show the similarity of language and purposes of the two
charters, and, second, for the reasoning which impelled the
conclusion.   In construing the legal effect of the Seattle
charter provision, which, like the Oakland charter, made no
express declaration as to the finality and conclusiveness of
the Civil Service Commission's findings, it was there said:

"In the absence of restraints imposed by the Constitution
or by statute the power of appointment implies the power
of removal, where no definite term is attached to the office
or employment by law.   (*People* v. *Lathrop,* 142 N. Y. 113
[36 N. E. 805]; *Easson* v. *Seattle,* 32 Wash. 405 [73 Pac.
496].)

"Again, where a statute or municipal charter provides that
a municipal officer may be removed for cause, the proceed-
ings for removal are judicial in their nature, and by the
weight of authority subject to review in the courts by proper
proceedings.   Under which class do the provisions in ques-
tion fall?   Section 8, art. 24, of the charter of the city of
Seattle, provides as follows: 'Unless otherwise provided by
law or this charter, each officer, board or department author-
ized to appoint any deputy, clerk, assistant or employee,
shall have the right to remove any person so appointed.'
Section 12, art. 16, of the same charter provides as follows:
'Every officer or employee in the classified civil service shall
hold office until removed or retired.   Any officer or employee
in such service may be removed by the appointing power
only upon the filing with the commission of a statement in
writing of the reasons therefor.   Any officer or employee so
removed may within ten days after his removal demand an
investigation.   The commission shall forthwith make such in-
vestigation and its finding and decision shall be certified
to the appointing officer, and if the removal is not sustained
thereby, the officer or employee so removed shall at once be
reinstated. . . . '   Had the charter stopped with the require-
ment that the appointing power should file with the commis-
sion a statement in writing showing the reasons for removal,
the charter would in all respects be analogous to section
108, Ballinger's Ann. Codes & St., which provides that,

'whenever the Governor is satisfied that any officer not liable to impeachment has been guilty of misconduct or malfeasance in office or is incompetent, he shall file with the Secretary of State a statement showing his reasons with his order of removal'; and in such cases we are satisfied that the courts are without jurisdiction to inquire into the question of removal, except possibly the legal sufficiency of the reasons assigned. (*O'Dowd* v. *Boston,* 149 Mass. 443 [21 N. E. 949].)

"The fact that another provision of the charter permits the officer or employee to demand an investigation at the hands of the civil service commission, and empowers the commission to reinstate him, does not, in our opinion, change the rule. In adopting the civil service system, for the purpose of securing and retaining in its employ competent servants, we are of opinion that the people of Seattle deemed it wise to impose no restrictions upon the power of removal, except a requirement that the reasons shall be stated in writing, and an investigation allowed by an impartial board of its own creation. In adopting a charter it was competent for the city to adopt the first rule above stated, which admits of a removal at pleasure and without cause, or the second, which only admits of a removal after a hearing and upon cause shown. In our opinion the city adopted a course midway between the two. It doubtless considered the requirement that the reasons for the removal should be stated in writing and made a matter of record a sufficient safeguard against improper removals, and an investigation by the civil service commission a sufficient protection to the discharged employee. Whether such provisions are wise or unwise is not for the consideration of this court. Where the system extends to a large number of employees, the right of every discharged employee to resort to the courts would doubtless impair in a measure the usefulness and efficiency of the system itself. In any event, we do not think that the framers of the charter ever intended that the courts should be resorted to in such cases. When, therefore, the appointing power files with the civil service commission a statement in writing showing good and sufficient reasons for the removal, and after investigation the commission confirmed the action of the appointing power, the removal is complete and any

further appeal must be to public opinion. (*Kimball* v. *Olmstead,* 20 Wash. 629 [56 Pac. 377]; *State ex rel. Gill* v. *Byrne,* 31 Wash. 213 [71 Pac. 746].)''

What this court said in the case of *Maxwell* v. *Civil Service Commission,* 169 Cal. 336, 339 [146 Pac. 871], involving the exercise of the powers and duties of the Civil Service Commission, may well be repeated: ''Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. They may decide a particular question wrong—but it is their question. Such boards are vested with a high discretion and its abuse must appear very clearly before the court will interfere.''

The triers of the dismissed employee were citizens of the municipality which they were serving and specially selected with reference to their knowledge of and experience in municipal administrative affairs with which they were brought into close contact, and there appears to be no greater reason to question the justness or wisdom of their judgment in the matters committed into their hands than there would be reason to doubt the decision of a court in similar matters. From the standpoint of administrative efficiency the weight of the argument preponderates in favor of the exercise of the power of the removal of officials for cause by the methods provided by municipal authority and by the persons charged with such duty. The better authority is that ''the power to remove officials for cause, while it is to be exercised in a judicial manner, is administrative, not judicial. It is a part of the power of a municipal corporation which is very useful, in fact almost necessary, for the efficient performance of the corporate duties.'' The power of removal is not subject to all the rules governing courts in the transaction of business. (*Butler* v. *Scholefield, Supervisor, etc.,* 54 Cal. App. 217 [201 Pac. 625], and a long list of cases therein cited.)

The petitioner in this case was removed after a full compliance with the existing regulations affecting the question of removal. In fact, it was upon his application that the appeal was heard and determined. The rule in such cases is strongly stated in *Boyd* v. *Pendegast, supra,* wherein it is said: ''Whether for *cause or without cause,* where the removal of an officer is accomplished after full compliance with existing regulations affecting the matter, no ground is

left upon which to found any action against the removing power. In the absence of regulations fixing the procedure on removal from office, the law defining the term may be looked to in deciding the question. Appointments to hold during the pleasure of the appointing power may be terminated at any time and without notice; appointments to continue 'during good behavior' or for a fixed term of years, cannot be terminated except for cause, and the authorities are generally to the effect that in the latter cases the officeholder is entitled to notice and an opportunity to be heard.''

Certain lines of authorities are cited to sustain the position that the evidence adduced upon the hearing before an inferior board or tribunal having limited jurisdiction may be brought up to the reviewing court upon *certiorari* for the sole purpose of determining whether or not from the evidence before it the finding of a jurisdictional fact by such inferior board or tribunal is sustainable, and if there be no evidence to sustain such decision it must be annulled. *Thrasher* v. *Board of Medical Examiners*, 44 Cal. App. 26 [185 Pac. 1006], *Stumpf* v. *Board of Supervisors*, 131 Cal. 364 [82 Am. St. Rep. 350, 63 Pac. 663], and *Englebretson* v. *Industrial Acc. Com.*, 170 Cal. 793 [151 Pac. 421], are fair representatives of the respective lines of authority relied upon. The first case had to do with an order of the state board of medical examiners revoking the license of the petitioner for unprofessional conduct under the Medical Practice Act. The district court of appeal annulled the order of the medical examiners revoking petitioner's license to practice medicine. Hearsay evidence in the nature of a dying declaration, and without which the charges against petitioner had no support whatever in the evidence, was received by the medical board. Such evidence was held inadmissible upon such hearings upon the authority of *Englebretson* v. *Industrial Acc. Com.*, *supra*. But it must be kept in mind that it is expressly provided by the Workmen's Compensation Act (Stats. 1913, p. 279), section 67, and by the Public Utility Acts (Stats. 1911 (Ex. Sess.), p. 18; Stats. 1915, p. 115), and the "Corporate Securities Act" (Stats. 1917, p. 673), that the decisions rendered by any of the commissions therein created are subject to review. This being so, they cannot be regarded as authority in this case. It is to

be observed that the Medical Practice Act (Stats. 1913, p. 722), does not provide for a review of or for an appeal from the medical examiners' decision revoking a license to practice medicine notwithstanding the fact that the holder thereof was thereby deprived of "a valuable property right in which, under the constitution and laws of the State he was entitled to be protected and secured." (*Hewett* v. *Board of Medical Examiners*, 148 Cal. 590, 592 [113 Am. St. Rep. 315, 7 Ann. Cas. 750, 3 L. R. A. (N. S.) 896, 84 Pac. 39].) This right cannot be taken away or infringed upon except by the lawful exercise of the police power. Therefore, when it was determined in *Thrasher* v. *Board of Medical Examiners, supra,* that the action of the board in depriving petitioner of that right went beyond the limitation of the lawful exercise of the police power the action was properly annulled on *certiorari.* The Thrasher case is therefore distinguishable from the instant case. The right to occupy an office does not carry with it any of the characteristics of property. A license to practice medicine does. A public office is a mere public agency created by the people for the purpose of the administration of the necessary functions of organized society and the agency may at any time be terminated by the power which created it. As between the office-holder and the sovereign power the right to hold a public office is not violated when the proper governmental authority, acting in pursuance of a power expressly given to it by the fundamental law, has removed such person from the office. (*Matter of Carter,* 141 Cal. 316 [74 Pac. 997]; *Boyd* v. *Pendegast, supra; French* v. *The Senate,* 146 Cal. 604 [2 Ann. Cas. 756, 69 L. R. A. 556, 80 Pac. 1031]; *Good* v. *Common Council,* 5 Cal. App. 265 [90 Pac. 44]; 29 Cyc. 1415.)

The determination of the question of the guilt or innocence of the petitioner was arrived at by the civil service board in the exercise of its jurisdiction, and however erroneous it may be it is not void for want of power to render the decision. The trial court reviews the action of the board as if it were a court of appeal instead of a court of review, and concluded that the board ought, under the evidence, to have annulled the order of the commissioner of health and safety. In other words, the effect of the action taken by the trial court is this: The civil service board had juris-

diction to annul the order made by the commissioner, but that it did not have jurisdiction to refuse to annul said order. This is a concession that the civil service board had the power and jurisdiction to hear and determine the appeal and that it committed error in the exercise of its jurisdiction. No rule of law is better settled than that error committed in the exercise of jurisdiction is not reviewable on *certiorari.* To justify a review of the evidence which goes to the merits of a controversy it must have some relation to the existence or nonexistence of jurisdictional facts.

*Roberts* v. *Police Court,* 185 Cal. 65 [195 Pac. 1053], seems to be conclusive against petitioner's contention. The commissioner of public health and safety who heard and determined the question of petitioner's removal, and the civil service board, to which an appeal was taken by petitioner, were each invested with jurisdiction to determine the matter submitted to them wrongfully upon the evidence presented as well as correctly. No question of jurisdictional facts is in the instant case. I think neither an excess nor lack of jurisdiction has been or can be pointed out. "On *certiorari,* as approvingly quoted in *Matter of Hughes,* 159 Cal. 360 [113 Pac. 684], 'upon every question except the mere question of power, the action of the inferior tribunal is final and conclusive.' In such a case a claim of insufficiency of evidence to show guilt of the offense charged does not go to the jurisdiction." (*Roberts* v. *Police Court, supra.*) I am unable to see how the instant case furnishes an exception to the general rule as pointed out in *Roberts* v. *Police Court, supra.*

The trial court held that there was absolutely no evidence to sustain either the order of the commissioner dismissing petitioner or to justify the civil service board's order dismissing the appeal. I think it erred in both respects. The petitioner had been a patrolman for a period of nine years and upon his admission was familiar with the rules and regulations of the service. On January 18, 1922, he filed a request for a leave of absence for a period of six months, to run without pay. He gave as his reason for requesting such a long leave that he was not well and was under the care of a physician. The chief stated to him that the charter did not provide for a leave of absence for so long a period and advised him to apply for a leave on account of sickness,

as the charter in case of sickness provided that a patrolman was entitled to a leave of absence for a period of sixty days on full pay and if at the end of that period he was not recovered he was entitled to sixty additional days on half pay. Garvin seemed displeased with the delay that had attended his request for a leave and in the discussion that followed he tendered his resignation as a patrolman, but the chief advised against this action and the acceptance of the resignation was not pressed. He obtained, however, a sick leave on February 24th and was shortly thereafter arrested on a charge of violating the National Prohibition Act. On March 10th, pending the investigation of said charge, he was indefinitely suspended from service by the commissioner of public health and safety. On March 18th the charge of violating said Prohibition Act was dismissed by the United States commissioner. The chief was not informed of this action until about the first of April, on which day he took the matter up with the commissioner of public health and safety. The chief's testimony is that he told the commissioner that in view of the dismissal of the charge by the United States commissioner there was nothing to do but to reinstate Garvin. He testified that a reinstatement had been agreed upon several days before the matter was set for hearing and that it was his intention to inform Garvin upon presenting himself that he had been reinstated. That he sent for Garvin for the purpose of informing him that he had been reinstated and to talk with him about his reinstatement and some other matters. The chief, no doubt, felt that it was his duty to talk with Garvin about his conduct as an officer, not necessarily as an inquisitor, but rather in an advisory way looking to the good of the service. The effect of his testimony is that the action of the United States commissioner had foreclosed inquiry as to the charge of violating the Prohibition Act. There is nothing in the chief's testimony or in his past relations with the petitioner to sustain any imputation whatever that he was actuated by sinister motives or that it was his purpose to attempt to entice or trick Garvin into an admission as to a violation of the prohibition law. The testimony of the chief was given before the civil service board and it was the exclusive province of that body to weigh his testimony, as well as the testimony of every witness who appeared, and give to it such weight and effect

as it might appear to the board to be entitled to receive. In so doing the general rules governing the weight and effect of the evidence and judging the credibility of witnesses were applicable. This duty was upon the civil service board and was not a prerogative belonging to a trial court on *certiorari*. It is true, as pointed out by the majority opinion, that the commissioner of public health and safety instructed the chief to get hold of Garvin and take the matter of suspension up with him. He said: "I did want him to talk the matter over with Garvin. There were many things that might be not sufficient to convict a man of a certain charge, but I really wanted to have him talk with Mr. Garvin because I was determined to have a clean police department and Mr. Garvin's character was in question and before I really reinstated—or signed the order of reinstatement—I wanted the chief to talk to him. That is the matter—that is the truth of the matter." Continuing, he said that he gave the chief to understand that if Garvin could satisfactorily explain the relationship regarding the charge he would be reinstated. Further, that if the chief had not been satisfied "after talking with Garvin all around" he believed that he would possibly have discharged him. He denied that there was a preconceived plan to oust petitioner. When asked if he considered petitioner's exoneration by the commissioner of the United States government to be final, he replied: "Not necessary at all; not necessarily so. I am not saying it was not. I did feel so, yes, but I am saying not necessarily so. We might have plenty of evidence sufficient, enough to discharge a man but not to convict him of crime." The witness then stated that the only facts that would have been presented to the civil service board in the matter of the suspension was the dismissal of the case by the United States commissioner, inasmuch as the suspension was predicated upon that charge and there was nothing else against the petitioner. He stated that he wanted to satisfy himself that Garvin was a fit officer in the police department. Questioned as to why he did not wish the matter to go to a hearing, he said that it was not necessary as the dismissal of the charge by the United States commissioner disposed of the entire matter and constituted an exoneration.

There are apparent inconsistencies in the testimony of the commissioner and it touches upon some matters not referred

to by the chief. These circumstances alone well illustrate the fallacy of a court of review attempting to revise or reverse findings of fact made by an officer or a tribunal clothed with power to hear and determine questions of fact upon conflicting or inconsistent evidence.

It is conceded that if the civil service board had found in favor of Garvin's appeal the finding could not be disturbed on appeal on the ground of a total failure of evidence to support it. But such was not the finding of the commission.

That the chief, who had been friendly with Garvin, was acting in good faith and intended to and would have informed him of the dismissal of the order of suspension in the conference to follow, there is no room to doubt. But Garvin refused to confer or to have any conversation with the chief except upon his own terms. It is now contended that the chief should have told Garvin in advance the nature of the subjects upon which he wished to speak, and particularly he should have told him that he had been reinstated. The chief got in touch with him over the telephone on Monday, the day prior to the time fixed for the hearing, and made an appointment with him to come to headquarters at 9:30 o'clock the following morning. Garvin absolutely ignored the appointment. After several attempts the chief succeeded, through his stenographer, in getting Garvin on the telephone. The stenographer informed him that the chief wanted him to come to his office and Garvin replied that he would not come. The chief then took up the conversation and told Garvin he wanted to talk with him at the office and Garvin replied that if he wanted to talk with him to "talk to his attorney" and abruptly hung up the phone. After further effort the stenographer again succeeded in getting Garvin on the phone and said to him, "The chief wants to speak to you and don't hang up on him again; give him a chance to talk to you." Garvin said: "All right." The chief took the phone and said: "I told you a few minutes ago that I wanted to see you down to the office and talk with you and I want to know if you are coming in or are you not." Garvin agreed to be at the office at 3 o'clock in the afternoon, at which time he appeared with an attorney. The chief stated to him that he wanted to see him alone. Garvin replied that he wanted his attorney to come in. The chief said, "You are still a

member of the police department until you are discharged, are you not?'' and Garvin's reply was, ''Yes, but I want my attorney to come in and hear what is being said.'' The chief then asked him if he was taking orders from him, as chief of police, or from his attorney, and Garvin replied, ''I am taking my own orders right now.'' The chief then asked, ''Are you coming in or are you not?'' Garvin replied, ''I am coming in if my attorney is coming in and if he is not coming in, I am not coming in.'' This ended the conversation and Garvin and his attorney went away. Two other members of the department were present and heard the conversation. Briefly stated, the conduct·as here related furnished the basis of the charge that resulted in Garvin's dismissal. While Garvin was under suspension he had not been dismissed from the service and I have no doubt that while he was not required to perform official duties, such as are described in the decisions relied upon in the majority opinion, he was amenable to the rules and regulations, which bore upon the discipline of the department.

Petitioner attempts to justify his refusal to have any communication with the chief except in the presence of his attorney on the ground that he suspected that his answers to questions asked by the chief would be ''distorted'' to his prejudice. This constituted a serious impeachment of the chief's integrity. It means that he believed that the chief would not hesitate to corruptly scheme to make a case against him. A lack of confidence on the part of an inferior officer in the integrity of his superior must necessarily affect efficiency. The request made by the chief to talk matters over with Garvin was a reasonable one. The refusal of Garvin to hold any communication with the chief officer except within the hearing of a third party is responsible for his failure to be informed that he had been reinstated. He was an experienced officer and knew his rights, and if the chief had attempted to draw him out on any matters that would have been improper or had a tendency to incriminate him he could and, doubtless would, have told him that he declined to go into that particular subject. That it was proper for the chief to have had an understanding with Garvin and to have discussed any matters, which might affect the efficiency or discipline of the police department, is scarcely a debatable question. For obvious reasons, third

persons are not permitted to attend such conferences. No police department could afford to tolerate such a practice.

The testimony of the chief is that he sent for Garvin to tell him that he had been reinstated. The charge of violating the Prohibition Act was with him a closed issue. He also wanted to talk with him on matters, no doubt, relating to the good of the service. Petitioner by his conduct denied him the privilege of performing that duty. Upon the showing thus made the commissioner of public health and safety held that petitioner's conduct was subversive of good order and the discipline of the department and dismissed him. The civil service board upon a hearing regularly had refused to disturb the order. Whether decided rightly or wrongly the question was one for the board to decide and not for us.

The rules that should be observed by courts when called upon to interfere with the order and business of executive or administrative boards is well stated in *Maxwell* v. *Civil Service Board,* 169 Cal. 336 [146 Pac. 869], *Pratt* v. *Rosenthal,* 181 Cal. 158 [183 Pac. 542], and *Hackett* v. *Morse,* 45 Cal. App. 788 [188 Pac. 308]. The object of the civil service system is to serve and promote the public welfare, not to intrench in office persons who for any reason do not fit into the plan or who will not submit to the orders of the executive heads.

If the administrative or executive powers which are reposed in municipalities by charter provisions are to be revised *ad libitum* by courts, civil service boards charged with the practical administration of such affairs must exercise extreme caution in discharging employees found by them to be incompetent or unfit to serve the public lest it involve itself in troublesome and expensive litigation commenced at the behest of dismissed employees.

I am of the opinion that the order of the lower court annulling the order dismissing petitioner from the service should be reversed.

MYERS, C. J.—I dissent.

I concur generally with the reasoning and conclusions of Mr. Justice Seawell except that I am not prepared to subscribe to the conclusion that under the language of the Oakland charter the decision of the civil service board is

not subject to review by the courts upon *certiorari*. That review, however, touches only the question of jurisdiction. Upon the admitted facts of this case the civil service board had jurisdiction, both of the subject matter and of the parties. It was expressly vested in this proceeding with the jurisdiction to hear and determine the appeal and to annul or affirm the order appealed from. If it did either of these upon insufficient evidence, its action in so doing was but error in the exercise of jurisdiction. As was pointed out in *Roberts* v. *Police Court*, 185 Cal. 65 [195 Pac. 1053], insufficiency of the evidence is never a ground for reversal of a judgment or order upon *certiorari* except when such evidence goes to prove the existence of *jurisdictional facts*. The jurisdictional facts herein were, first, the order of the head of the department discharging the petitioner, and, second, the taking of an appeal by petitioner to the civil service board within five days thereafter. The existence of these facts was *conceded* throughout this proceeding. The evidence which the prevailing opinion herein deems insufficient goes solely to the merits of the controversy. Upon the question of its sufficiency for this purpose the decision of the civil service board, whether right or wrong, is not open to review upon *certiorari*. If we were authorized upon this review to consider the sufficiency of the evidence to support the conclusion upon the merits (which we are not), I should agree with the conclusion of Mr. Justice Seawell that the evidence is not insufficient to support a finding that petitioner's conduct was subversive of the discipline of the department, and that the decision of the civil service board should, therefore, be affirmed, even if this were a review upon appeal.

Waste, J., concurred.

Rehearing denied.

Myers, C. J., Waste, J., and Seawell, J., dissent from the order denying the petition for rehearing.