[S.F. No. 22429. In Bank. Mar. 27, 1967.]

BENNY MAX PARRISH, Plaintiff and Appellant, v. THE
CIVIL SERVICE COMMISSION OF THE COUNTY
OF ALAMEDA, etc., et al., Defendants and Respondents.

Albert M. Bendich and Coleman A. Blease for Plaintiff and Appellant.

Robert H. Laws, Jr., B. V. Yturbide, Marshall W. Krause and Ruth Jacobs as Amici Curiae on behalf of Plaintiff and Appellant.

J. F. Coakley, District Attorney, and Richard H. Klippert, Assistant District Attorney, for Defendant and Respondent.

TOBRINER, J.—In the present case an Alameda County social worker, discharged for "insubordination" for declining to participate in a mass morning raid upon the homes of the county's welfare recipients, seeks reinstatement with back pay on the ground that such participation would have involved him in multiple violations of rights secured by the federal and state Constitutions. He urges that his superiors could not properly direct him to participate in an illegal activity and that he could not, therefore, be dismissed for declining to follow such directions.

The county acknowledges that it has subsequently abandoned the method of mass morning raids to determine welfare eligibility and that such operations are now forbidden by the applicable state and federal regulations.[1] Since these regulations were not in force at the time of the plaintiff's dismissal,

[1] The state and federal regulations which bar such searches are, respectively, section V(B) of "Special Methods of Investigation," Department of Social Welfare Bulletin No. 624 (revised), effective September 1, 1963, and section 2220, item 1, and section 2230, item 1, of the United States Department of Health, Education and Welfare, Handbook of Public Assistance Administration, issued March 18, 1966, requiring state conformance therewith by July 1, 1967.

however, we must determine whether he could properly refuse to participate in the welfare raids on the ground that they infringed rights of constitutional dimension.

█ For the reasons set forth in this opinion we have decided that the county's failure to secure legally effective consent to search the homes of welfare recipients rendered the mass raids unconstitutional. We have determined further that, even if effective consent had been obtained, the county could not constitutionally condition the continued receipt of welfare benefits upon the giving of such consent. We have therefore held, for these two independently sufficient reasons, that the project in which the county directed the plaintiff to take part transgressed constitutional limitations. █ In light of plaintiff's knowledge as to the scope and methods of the projected operation, we have concluded that he possessed adequate grounds for declining to participate.

On November 21, 1962, the Board of Supervisors of Alameda County ordered the county welfare director to initiate a series of unannounced early-morning searches of the homes of the county's welfare recipients for the purpose of detecting the presence of "unauthorized males."[2] The searches were to be modeled on a Kern County project popularly known as "Operation Weekend."

Neither in planning nor in executing the searches did the county authorities attempt to secure appropriate search warrants. The social workers who conducted the searches were not required or permitted to restrict them to the homes of persons whom they had probable cause to arrest, or even to the homes of those welfare recipients whose eligibility they had any reason to doubt. Indeed, as will later appear, the majority of persons whose homes were searched were under no suspicion whatever and were in fact subjected to the raid for that very reason.

The Alameda County searches, popularly and reportorially dubbed "Operation Bedcheck," commenced on Sunday, January 13, 1963, at 6:30 a.m.[3] Although the county welfare

---

[2] Welfare and Institutions Code section 11351 (formerly § 1508) provides that the amount of a grant on behalf of a needy child is to be computed after considering the income of any adult male "assuming the role of spouse" to the child's mother, whether married to her or not.

[3] At the civil service commission proceeding the welfare department's division chief testified: "We indicated that the operation should start at 6:30 A.M. [I]f they were using County automobiles . . . they should leave the County lot at 6:30 A.M. If they were leaving directly from their home . . . the call should start at approximately 6:30 as the first call."

department contained a 10-man fraud unit whose members ordinarily investigated all cases of suspected fraud, that unit could not adequately staff an operation of the sweep contemplated by the supervisors. Accordingly, despite the fact that the county's social workers did not ordinarily conduct fraud investigations, their services were necessary for this undertaking.

Since the social workers lacked experience with the techniques employed by the fraud investigators they received special instruction in the procedures to be followed. Their superiors instructed them to work in pairs with one member covering the back door of each dwelling while the recipient's own social worker presented himself at the front door and sought admittance. Once inside, he would proceed to the rear door and admit his companion. Together the two would conduct a thorough search of the entire dwelling, giving particular attention to beds, closets, bathrooms and other possible places of concealment.

Plaintiff was one of the social workers chosen to participate in the first wave of raids. Upon learning the nature of the proposed operation, he submitted a letter to his superior declaring that he could not participate because of his conviction that such searches were illegal. After plaintiff had explained his position to the division chief and the welfare director, he was discharged for insubordination.

■ ''Insubordination can be rightfully predicated only upon a refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed.'' (*Garvin* v. *Chambers* (1924) 195 Cal. 212, 224 [232 P. 696]; *Sheehan* v. *Board of Police Comrs.* (1925) 197 Cal. 70, 78 [239 P. 844]; *Forstner* v. *City & County of San Francisco* (1966) 243 Cal.App.2d 625, 632 [52 Cal.Rptr. 621].) Plaintiff contends that his superiors were not entitled to compel his participation in illegal searches and urges that such participation might have exposed him to severe penalties under federal law.[4]

---

[4]One who, clothed with the authority of a state agency, invades and searches a home without a warrant and without probable cause to effect an arrest upon the premises may incur civil liability to the occupant under section 1983 of title 42 of the United States Code. (See *Monroe* v. *Pape* (1961) 365 U.S. 167 [5 L.Ed.2d 492, 81 S.Ct. 473]; *Cohen* v. *Norris* (9th Cir. 1962) 300 F.2d 24, 31-32; *Beauregard* v. *Wingard* (S.D. Cal. 1964) 230 F.Supp. 167, 173-177.) Moreover, under section 242 of title 18 of the United States Code, wilful participation in a state-directed activity which infringes any right secured by the federal Constitution is a misdemeanor, punishable by a fine of not more than $1,000 or imprison-

Accordingly we must determine, as the central issue in the present case, the constitutionality of the searches contemplated and undertaken in the course of the operation. By their timing and scope those searches pose constitutional questions relating both to the Fourth Amendment's stricture against unreasonable searches and to the penumbral right of privacy and repose recently vindicated by the United States Supreme Court in *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678].[5]

At the outset we must identify the standards which govern the constitutionality of such searches. ▮ Although misrepresentation of welfare eligibility constitutes a crime, by virtue both of special legislation directed to that evil (Welf. & Inst. Code, §§ 11265, 11482 [formerly §§ 1563, 1577]) and the general grand theft statutes (Pen. Code, §§ 484, 487; see *People* v. *Bailey* (1961) 55 Cal.2d 514, 516-518 [11 Cal.Rptr. 543, 360 P.2d 39]; *People* v. *Ryerson* (1962) 199 Cal.App.2d 646, 649-650 [19 Cal.Rptr. 22]), the county nevertheless contends that the searches undertaken in the course of the operation need not meet the standards ordinarily applied to searches for evidence of crime. It predicates this contention upon its claim that the searches were designed primarily to secure proof of welfare ineligibility so as to reduce the number of persons on welfare rather than to lay the basis for criminal prosecutions.[6]

▮ In evaluating the county's contention our principal recourse must be to the decision of the United States Supreme Court in *Frank* v. *Maryland* (1959) 359 U.S. 360 [3 L.Ed.2d 877, 79 S.Ct. 804], wherein the court countenanced a distinction between searches directed to the procurement of evidence of crime and searches aimed toward the advancement of the

ment for not more than one year, or both. (See *United States* v. *Price* (1966) 383 U.S. 787 [16 L.Ed.2d 267, 86 S.Ct. 1152]; *Screws* v. *United States* (1945) 325 U.S. 91 [89 L.Ed. 1495, 65 S.Ct. 1031]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 436 [282 P.2d 905, 50 A.L.R.2d 513].) (*But see* Note, *Federal Judicial Review of State Welfare Practices* (1967) 67 Colum.L.Rev. 84, 96 fn. 76.)

[5]See, generally, *Symposium on the Griswold Case and the Right of Privacy* (1965) 64 Mich.L.Rev. 197.

[6]The county cannot now effectively preclude the possibility that, in an appropriate case, it would have undertaken criminal proceedings on the basis of evidence secured in the operation. That possibility suggests the danger that ''the administrative officer who invades the privacy of the home may be only a front for the police who are thus saved the nuisance of getting a warrant.'' (*Abel* v. *United States* (1960) 362 U.S. 217, 242 [4 L.Ed.2d 668, 80 S.Ct. 683] [Douglas, J., dissenting].)

general welfare by means other than criminal prosecutions.[7] In that case the court upheld a Baltimore ordinance requiring the occupant of any premises to admit a city health inspector whenever the latter "shall have cause to suspect that a nuisance exists . . . therein" and shall have "demand[ed] entry therein in the day time. . . ." (359 U.S. at p. 361.) Examination of the *Frank* opinion discloses four separate and independently sufficient factors which render its holding inapplicable to the case before us.

First, the evidence sought by the health inspector in the *Frank* case would not itself have afforded a basis for criminal prosecution. The Baltimore ordinance did not penalize the mere maintenance of a nuisance; it authorized the imposition of sanctions only when the health inspector had ascertained the existence of a nuisance and had issued an abatement order which the owner thereafter wilfully disobeyed.

Clearly mindful of this aspect of the Baltimore ordinance, the court repeatedly stressed the fact that discovery of a nuisance on the premises would not, without further culpable acts on Frank's part, have supported criminal prosecution. "The attempted inspection . . . ," the court noted, "was merely to ascertain the existence of evils to be corrected upon due notification or, in default of such correction, to be made the basis of punishment." (359 U.S. at p. 362; see also p. 366.) In the present case, however, the evidence sought by the Alameda County authorities would have afforded a basis for prosecution without further action on their part or subsequent culpable conduct by the recipient.

Second, the *Frank* court drew a line between searches which advance the general welfare without recourse to criminal proceedings and "searches for evidence to be used in criminal prosecutions *or for forfeitures.*" (Italics added.) (359 U.S. at p. 365.) Since the court thus declared that a search directed at securing evidence in aid of a forfeiture should be treated in the same manner as a search for evidence of crime, the *Frank* decision affords no support to the authorities of Alameda County who, by their own account, were seeking

[7] If the *Frank* distinction between criminal and noncriminal searches should fall, the county's contention would of course collapse. Although two cases now pending before the United States Supreme Court (*Camara* v. *Municipal Ct. of San Francisco, No. 92; See* v. *City of Seattle, No. 180* [*prob. juris. noted* (1966) 385 U.S. 808 [17 L.Ed.2d 50, 87 S. Ct. 31]]) raise the question of whether the *Frank* doctrine should be overruled, we may assume for present purposes that the court will adhere to its holding in *Frank* since, as we explain below, we do not find that holding controlling under the circumstances here before us.

evidence of ineligibility for the express purpose of cancelling welfare benefits.

Third, the court emphasized the limited scope of the Baltimore ordinance in that it authorized searches only if the health commissioner had "cause to suspect that a nuisance exists." (See, e.g., 359 U.S. at p. 366.) In this connnection, the court noted that the inspector who sought admittance to Frank's home had received reports of rats in the area and had conducted an external examination of the house which had revealed "that [it] was in an 'extreme state of decay,' and that in the rear of the house there was a pile later identified as 'rodent feces mixed with straw and trash and debris to approximately half a ton.' " (359 U.S. at p. 361.) Under these circumstances the court upheld the ordinance, observing that "The power of inspection granted by the Baltimore City Code is strictly limited. . . . Valid grounds for suspicion of the existence of a nuisance must exist. Certainly the presence of a pile of filth in the backyard combined with the run-down condition of the house gave adequate grounds for such suspicion." (359 U.S. at p. 366.)

In the present case the county did not attempt to limit the searches to the homes of persons against whom the welfare authorities harbored any suspicion, reasonable or otherwise. On the contrary, a majority of the homes subjected to the raid were included solely because the authorities entertained *no* suspicion regarding their occupants.

Finally, the *Frank* court expressly limited its approval of administrative searches without warrants to those undertaken during daylight hours and without inconvenience to the occupants. Under the Baltimore City Code, the court stressed, "The inspection must be made in the day time. Here was no midnight knock on the door, but an orderly visit in the middle of the afternoon with no suggestion that the hour was inconvenient." (359 U.S. at p. 366; see also pp. 367-368.) The great gulf which separates an "orderly" afternoon visit from the searches conducted shortly after dawn in the present case would itself suffice to deprive defendant of any support from the *Frank* opinion.

On the basis of the foregoing analysis we conclude that the searches contemplated and undertaken in the course of the operation in the present case must be deemed unconstitutional unless the county can show compliance with the standards which govern searches for evidence of crime. ■ [See fn.

8] The county concedes that it sought no warrants for these searches[8] and that it lacked probable cause to arrest any person in any of the homes searched, but contends that the searches took place pursuant to effective consent, freely and voluntarily given. (*People* v. *McLean* (1961) 56 Cal.2d 660, 664 [16 Cal.Rptr. 347, 365 P.2d 403] ; *People* v. *Burke* (1956) 47 Cal.2d 45, 49 [301 P.2d 241].)

### The alleged consent to search.

■ Our first task is to analyze the county's argument that the raids entailed no unlawful searches because the authorities instructed the searchers to refrain from forcing their way into any home. They were, instead, to report any refusal of entry to their superiors for such further action as might be deemed appropriate. The record indicates that, under the county's established practice, a reported refusal of entry could serve as a basis for terminating welfare benefits. The record also establishes that welfare recipients must depend to a remarkably high degree upon the continued favor of their social workers, who are vested with wide discretion to authorize or prohibit specific expenditures.[9] Accordingly, we must determine whether the threat of sanctions necessarily implicit in a request for entry under such circumstances vitiated the apparent consent which the searchers sought to secure from the occupants.

With increasing frequency the courts have denied the efficacy of any consent to a search obtained by covert threats of official sanction or by implied assertions of superior authority. The courts have been quick to note the disparity of position between a government agent and an ordinary citizen; they have taken cognizance of the threat of unspecified reprisals which inheres in the official request for admission. (See, e.g.,

---

[8]Since the searches were made without warrants, the county of course bears the burden of justifying them. (See *People* v. *Henry* (1967) 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557], and cases there cited.)

[9]This discretion, limited by no standard and subject to no appeal, heightens the peril faced by any recipient bold enough to deny entry. Not surprisingly, none of the recipients were so daring here. (See Respondent's Reply Brief, p. 10.) In *Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247], the court struck down a statute requiring teachers to report their membership in any organization, noting that ''Such interference with personal freedom is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made—those who any year can terminate the teacher's employment without bringing charges, without notice, without a hearing, without affording an opportunity to explain.'' (364 U.S. at p. 486.) (Cf. *Note, op. cit. supra*, 67 Colum.L.Rev. 84, 93.)

*Pekar* v. *United States* (6th Cir. 1963) 315 F.2d 319, 324-325; *Canida* v. *United States* (5th Cir. 1958) 250 F.2d 822, 825, and cases there cited.) As the court stated in *Judd* v. *United States* (D.C.Cir. 1951) 190 F.2d 649, 651, ''The Government must show a consent that is 'unequivocal and specific' [citation], 'freely and intelligently given.' [Citation.] Thus 'invitations' to enter one's house, extended to armed officers of the law who demand entrance, are usually to be considered as invitations secured by force. [Citation.] A like view has been taken where an officer displays his badge and declares that he has come to make a search [citation], even where the householder replies 'All Right.' [Citation.] . . . Intimidation and duress are almost necessarily implicit in such situations; if the Government alleges their absence, it has the burden of convincing the court that they are in fact absent.'' (*Accord, Channel* v. *United States* (9th Cir. 1960) 285 F.2d 217, 219-221.)

Thus in *Johnson* v. *United States* (1948) 333 U.S. 10 [92 L.Ed. 436, 68 S.Ct. 367], the United States Supreme Court voided a conviction based upon evidence secured after the defendant had admitted officers who told her that they wanted ''to talk to [her] a little bit.'' (333 U.S. at p. 12.) The court concluded that ''Entry to defendant's living quarters . . . was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right.'' (333 U.S. at p. 13.) Similarly, in *United States* v. *Slusser* (S.D. Ohio 1921) 270 F. 818, 819, the court declared: ''The search so permitted . . . after declaration by the prohibition officer, with a display of his badge, that they were there to search the premises, was not by such consent as will amount to a waiver of constitutional rights, but, on the contrary, is to be attributed to a peaceful submission to officers of the law.'' (See also *Amos* v. *United States* (1921) 275 U.S. 313, 317 [55 L.Ed. 654, 41 S.Ct. 266]; *People* v. *Henry, supra,* 65 Cal.2d 842, 846; *People* v. *Shelton* (1964) 60 Cal.2d 740, 745-746 [36 Cal.Rptr. 433, 388 P.2d 665], and cases there cited.)

Our case proceeds far beyond a mere request for admission presented by authorities under color of office. Thus we need not determine here whether a request for entry, voiced by one in a position of authority under circumstances which suggest that some official reprisal might attend a refusal, is itself sufficient to vitiate an affirmative response by an individual who

had not been apprised of his Fourth Amendment rights.[10] The persons subjected to the instant operation confronted far more than the amorphous threat of official displeasure which necessarily attends any such request. The request for entry by persons whom the beneficiaries knew to possess virtually unlimited power over their very livelihood posed a threat which was far more certain, immediate, and substantial.[11] These circumstances nullify the legal effectiveness of the apparent consent secured by the Alameda County searchers.[12]

Both this court and the Supreme Court of the United States have recently emphasized the heavy burden which the government bears when it seeks to rely upon a supposed waiver of constitutional rights.[13] The county has not sustained that burden here.

### The consequences of failure to consent.

Even if we could conclude, however, that the consent secured by the Alameda County searchers constituted a knowing and fully voluntary waiver of Fourth Amendment rights, that conclusion would not establish the constitutionality of the operation involved in this case. That operation rested upon the assumption that a welfare agency may withhold aid from recipients who do not willingly submit to random, exploratory searches of their homes; from its incep-

[10]See *United States* v. *Nikrasch* (7th Cir. 1966) 367 F.2d 740, 744; *United States* v. *Blalock* (E.D. Pa. 1966) 255 F.Supp. 268; *People* v. *Henry, supra,* 65 Cal.2d 842, 846; Note, *Consent Searches: A Reappraisal After Miranda* v. *Arizona* (1967) 67 Colum.L.Rev. 130.

[11]In *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 534 [9 L.Ed2d 922, 83 S.Ct. 917], the United States Supreme Court regarded a threat that ''state financial aid for [the dependant's] children would be cut off'' as an important element of coercion in determining the voluntariness of defendant's confession.

[12]In a recent article devoted entirely to the problem of nighttime welfare searches, Professor Charles Reich canvasses the available authorities and concludes that ''there is no theory under which it can be said that public assistance recipients consent, expressly or impliedly, to searches of their homes. The official demand for entrance is sufficient to render any apparent consent involuntary and the threat of loss of public assistance underscores the coercive nature of the demand for entry.'' (Reich, *Midnight Welfare Searches and the Social Security Act* (1963) 72 Yale L.J. 1347, 1350.) (See also ten Broek, *California's Dual System of Family Law: Its Origin, Development and Present Status* (1965) 17 Stan.L.Rev. 614, 670.)

[13]See, e.g., *Miranda* v. *Arizona* (1966) 384 U.S. 436, 475-476 [16 L.Ed.2d 694, 86 S.Ct. 1602]; *Brookhart* v. *Janis* (1966) 384 U.S. 1, 4, 7 [16 L.Ed.2d 314, 86 S.Ct. 1245]; *People* v. *Stewart* (1965) 62 Cal.2d 571, 581 [45 Cal.Rptr. 201, 400 P.2d 97], affd. *sub'. nom. Miranda* v. *Arizona, supra,* 384 U.S. 436, 497-499.

tion, the operation contemplated the use of such searches to threaten the withdrawal of welfare benefits from anyone who insisted upon his rights of privacy and repose. In light of the resulting pressure upon welfare recipients to sacrifice constitutionally protected rights, the ultimate legality of the operation in which the plaintiff refused to participate must turn on whether the receipt of welfare benefits may be conditioned upon a waiver of rights embodied in the Fourth Amendment.

In *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409], and *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559 [55 Cal.Rptr. 505, 421 P.2d 697], this court recently reviewed the so-called ''doctrine of unconstitutional conditions,''[14] concluding that the power of government to decline to extend to its citizens the enjoyment of a particular set of benefits does not embrace the supposedly ''lesser'' power to condition the receipt of those benefits upon any and all terms.

When, as in the present case, the conditions annexed to the enjoyment of a publicly conferred benefit require a waiver of rights secured by the Constitution, however well-informed and voluntary that waiver, the governmental entity seeking to impose those conditions must establish: (1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit. (*Bagley* v. *Washington Township Hospital Dist.*, *supra*, 65 Cal.2d 499, 501, 505-508; *Rosenfield* v. *Malcolm*, *supra*, 65 Cal.2d 559, 561; see Note, *op, cit., supra*, 67 Colum.L.Rev. 84, 101 & fn. 104; cf. *Symposium on the*

---

[14] A sampling of the more informative decisions and articles on this subject would include: *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed. 2d 965, 3 S.Ct. 1790]; *Speiser* v. *Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332]; *Hannegan* v. *Esquire, Inc.* (1946) 327 U.S. 146 [90 L.Ed. 586, 66 S.Ct. 456 ]; *Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885]; O'Neil, *Unconstitutional Conditions: Welfare Benefits With Strings Attached* (1966) 54 Cal.L. Rev. 443; Comment, *Unconstitutional Conditions: An Analysis* (1961) 50 Geo.L.J. 234; Note, *Unconstitutional Conditions* (1960) 73 Harv. L.Rev. 1595.

*Griswold Case and the Right of Privacy, op. cit. supra,* 64 Mich.L.Rev. 197, 251.)

 Although we can conceive of unusual situations in which the government might properly predicate continued welfare eligibility upon consent to unannounced early morning searches, the record fails to develop any justification for such a condition here. Under some circumstances the county might be able to establish that a requirement of consent to such searches would facilitate the detection of frauds which deplete the welfare fund. As noted above, we would then be called upon to decide whether the benefits derived from the imposition of such a condition outweighed the corresponding impairment of constitutional rights. We could not resolve this issue upon the record now before us, because the evidence adduced in the present case fails to establish the incidence of welfare fraud or the efficacy of mass morning raids in reducing such fraud.[15]

In any event the instant operation does not meet the last of the three requirements which it must satisfy: so striking is the disparity between the operation's declared purpose and the means employed, so broad its gratuitous reach, and so convincing the evidence that improper considerations dictated its ultimate scope, that no valid link remains between that operation and its proffered justification.

We recall the crucial fact that the county authorities deliberately declined to restrict their searches to the houses of those recipients as to whom they entertained some reason, however remote, to suspect fraud. The standing orders of the Alameda County social workers required them to report all cases of suspected ineligibility to the fraud unit for further inquiry. The record establishes that the social workers consistently followed these orders, referring for investigation all cases which they had any reason to doubt, even when their suspicion rested on no more than an anonymous phone call or letter; in compiling the list of homes to be raided in the course of the operation the county authorities excluded all cases which had been referred to the fraud unit.

Moreover, the workers designated to participate in the operation were told that at least half of the homes to be searched should be chosen at random from their *nonsuspect cases.* The

[15]By a series of doubtful rulings, plaintiff was prevented from introducing evidence which he claimed would demonstrate that such searches were neither necessary nor effective.

remaining homes would of course be those which, despite the social workers' doubts, had not been deemed sufficiently suspect to warrant referral to the fraud unit.[16] Any welfare worker who had referred all of his doubtful cases to the fraud unit was instructed to make *all* of his selections at random.

In his initial testimony before the civil service commission, the county welfare director stated that he included non-suspect cases in his instructions because he had been ordered to imitate the Kern County operation and had been advised by the Kern County director that nonsuspect cases were included there. Later, however, after plaintiff's counsel had indicated that he would introduce evidence that the Kern County searches had been confined to suspect homes, county counsel agreed to stipulate that ''at the time that Mr. Kehoe [the Alameda County director] discussed the matter of the early morning visitations with Mr. Bell of the Social Welfare Department of Kern County . . . Mr. Bell told him that of the cases that were picked in Kern County, they had a random sampling and that there was no differentiation between the suspect cases and the nonsuspect cases, but that after the early morning visitations were concluded in Alameda County . . . Mr. Kehoe had another discussion with Mr. Bell of Kern County, and at that time Mr. Bell informed him that all of the cases in Kern County were suspect.''

The record clearly shows that the Alameda County director was anxious to include nonsuspect homes in order to provide a dramatic public demonstration of the efficiency of the Alameda County welfare program and the low incidence of fraud. In the interview which he conducted with plaintiff prior to discharging him, he stated: ''As you well know, the ANC Program is under public fire. Something needs to be done in a dramatic way to prove the point . . . that the vast majority of these people are legitimately on the program.'' Similarly, in his testimony before the civil service commission the director declared: '' [A]s long as a non-suspect group were to be included . . . we should try to include these in a fashion which would bring to our attention, as well as the public attention, our belief that an across-the-board look at the case load would confirm our opinion that . . . the case load by

---

[16]The testimony shows that during the pendency of the operation the standard for referrals to the fraud unit was reduced, thus further curtailing the number of suspect cases which were subject to the searches.

and large . . . would not show up in a bad light on a true random sample approach. . . ."[17]

However laudable the goal of the Alameda County authorities to persuade the public that the incidence of welfare fraud falls below popular estimates, we cannot accept the view that they were free to advance that objective by indiscriminate raids upon the homes of persons selected solely because their honesty could be exploited to dramatize the point which the authorities wished to make.[18] Even if we were to assume that a public demonstration of the contemplated type might tend to further the purposes of the welfare program, any such speculative benefit must yield before the far more immediate and substantial right of innocent persons to be secure in their homes.

In *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 609 [21 Cal.Rptr. 522, 371 P.2d 288], we condemned a "general exploratory search" of public restrooms, noting that the "[a]uthority of police officers to spy on occupants of toilet booths . . . will not be sustained on the theory that if they watch enough people long enough some *malum prohibitum* acts will eventually be discovered." Yet such general exploratory searches pale beside a raid expressly directed into the homes of persons known to be under no suspicion.

Not only has the county failed to demonstrate that the scope of the raids was closely correlated to the achievement of some legitimate end, but alternate means for the detection of fraud less subversive of constitutional rights were available to the county. For example, the welfare director testified that in investigating suspect cases his workers would maintain an external watch "[u]ntil such time as there [was] sufficient indication to warrant the request to enter the home and look through it." No one has explained why such safeguards, accorded in *suspect* cases, were denied the *nonsuspect* persons subject to the operation. The foregoing factors indicate so

---

[17]The chief of plaintiff's division also testified that nonsuspect cases were included to "give an indication or a true picture of actually what was existing in the total caseloads rather than just exactly the suspicious cases." To like effect was the testimony of the assistant welfare director, who agreed with the statement of plaintiff's counsel that "the purpose for including the non-suspect cases within the operation . . . was to demonstrate that there was no reason for fear that . . . there was undetected fraud existing among those cases . . . ."

[18]"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." (*Olmstead* v. *United States* (1928) 277 U.S. 438, 479 [72 L.Ed. 944, 48 S.Ct. 564, 66 A.L.R. 376] [Brandeis, J., dissenting].)

marked a lack of congruence between the scope of the operation and the legitimate goal of reducing welfare fraud as to deprive that procedure of any constitutional justification.

In seeking to defend the conduct of its officers, the county places great stress upon the fact that while examining the 422 homes subjected to the operation, the searchers also made inquiries into such routine matters as the amount of food in each home. Obviously, the accomplishment of these functions did not necessitate an operation of the type which the county here undertook.

### *The grounds for plaintiff's refusal to participate in the search.*

 At oral argument before this court, county counsel did not seek to establish the constitutionality of the searches but urged that, whatever the legal status of the operation, the county could still discharge plaintiff because, at the time he refused to participate in it, he had not yet learned of the unconstitutional nature of the contemplated searches.

The record supports no such claim. On the contrary, the uncontradicted evidence establishes that prior to plaintiff's refusal to participate, he had been advised of the purpose, timing, and scope of the searches, and of the fact that at least one-half of the homes to be searched would be chosen at random from nonsuspect cases. Moreover, in explaining to his superiors the reasons for his unwillingness to participate, plaintiff repeatedly stated that he believed the county could not legally search the homes of those known to be under no suspicion.

The board of supervisors issued its directive concerning the initiation of the operation on November 21, 1962. Thereafter, on January 3, 1963, the plaintiff attended a briefing at which he and the other social workers were told about the objectives of the operation, its timing and scope, and the strategy of operating in pairs. At this meeting the social workers were also instructed to prepare their lists of homes for the proposed search and to choose at least one-half of the cases from among persons whom they did not suspect.[19]

After attending this briefing, plaintiff discussed his doubts

[19]After plaintiff's dismissal the social workers attended a second meeting at which they received further briefing. The only additional information given to them at the second meeting which might have affected the constitutionality of the searches was the greater stress then laid upon the need to secure the consent of the recipients before entering their homes.

with his immediate superior. The superior, appearing on behalf of the county, gave the following account of the ensuing conversations: "We discussed the whole issue in great detail for at least a week . . . . His final reply, after a week's preliminary discussion [was], 'This I cannot do.' . . . He felt that he did not wish to go on these so-called random visits, as this would appear that his clients would be guilty of something that we have no proof of . . . . He did not object to suspect cases, however, his objection was lying in the realm of the random cases as he felt this assumed a guilt on the part of the recipient that had not been proven . . . . I asked him whether he felt that his handicap would interfere with his making these calls [plaintiff is only partially sighted] or whether it was possibly one of transportation due to the hour involved; however, he felt that this was a matter of principle with him and stated, 'This, I cannot do.' . . . We discussed it a whole week trying to come up with some answer . . . to evaluate all aspects and we were unable to come to an agreement, and [hence] the subsequent outright refusal."

After these conversations proved futile, plaintiff submitted to the division chief a memorandum citing his reasons for declining to participate in the searches. Foremost among the reasons listed was plaintiff's conviction that the searches indicated "the presumptive guilt of all recipients" and constituted "an invasion of the privacy of recipients."

Since the record establishes that the information known to plaintiff at the time he made his decision gave him reasonable grounds to believe that the operation would be unconstitutional, that he did so believe, and that the operation, as ultimately conducted, was in fact unconstitutional, we need not consider how we would decide this case had any one of these elements been missing.

We fully recognize the importance of ferreting out fraud in the inexcusable garnering of welfare benefits not truly deserved. Such efforts, however, must be, and clearly can be, conducted with due regard for the constitutional rights of welfare recipients. The county welfare department itself has now abandoned the technique of investigation which it pursued here; we may thus rest assured that it will develop other more carefully conceived procedures. It is surely not beyond the competence of the department to conduct appropriate investigations without violence to human dignity and within the confines of the Constitution.

The judgment is reversed and the cause is remanded to the trial court with directions to enter judgment in accordance with this opinion.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Peek, J.,* concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Taylor in the opinion prepared by him for the Court of Appeal in *Parrish* v. *Civil Service Com.* (Cal.App.) 51 Cal.Rptr. 589.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.