[Civ. No. 13504. Third Dist. Aug. 1, 1972.]

ROBERT B. CARLESON, as Director, etc., Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
GOLDEN GATE WELFARE RIGHTS ORGANIZATION, INC.,
Real Party in Interest.

**COUNSEL**

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Raymond M. Momboisse and N. Eugene Hill, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Jay-Allen Eisen and Ralph Santiago Abascal for Real Party in Interest.

**OPINION**

**JANES, J.**—In December 1971 the state Department of Social Welfare (hereinafter, "DSW"), through its Director (hereinafter, "the Director"), inaugurated the Earnings Clearance System (hereinafter, "System"), a computerized method for checking earnings reported to county welfare departments by California recipients of Aid to Families with Dependent Children (hereinafter, "AFDC").[1] The System operates as follows: On a quarterly basis, the DSW sends to the state Department of Human Resources Development (hereinafter, "DHRD") the social security numbers of all persons, 16 years of age or older, who received AFDC during the *second prior* quarter. The DHRD matches the social security numbers against its files showing wages reported to it by employers as having been paid during the second and third prior quarters to persons with those numbers. (See Unemp. Ins. Code, § 1088.)[2] Thus an individual must have been a recipient of AFDC approximately six months prior to the time the System obtains information about his earnings, and the earnings information itself is about six months old. The DHRD transmits the information to the DSW, which dis-

---

[1] AFDC, one of the so-called "categorical assistance" programs, is funded by the federal and state governments pursuant to the Social Security Act. (42 U.S.C. § 601 et seq.; see, *Rosado* v. *Wyman* (1970) 397 U.S. 397, 407-408 [25 L.Ed.2d 442, 453, 90 S.Ct. 1207, 1215-1216]; *King* v. *Smith* (1968) 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125, 88 S.Ct. 2128, 2133].) The AFDC program is implemented in California by the Welfare and Institutions Code (§ 11200 et seq.).

[2] The DHRD administers the law relative to payment of unemployment and disability compensation benefits. (Unemp. Ins. Code, §§ 134, 301.) Wage information reported to the DHRD by employers is generally "for the exclusive use and information" of that department (Unemp. Ins. Code, § 1094), except that Unemployment Insurance Code section 1095 provides in relevant part that "The director [of the DHRD] shall permit the use of any information in his possession to the extent necessary . . . (e) To enable the Director of Social Welfare or his representative subject to federal law to verify or determine the eligibility or entitlement of an applicant for, or a recipient of, public social services provided pursuant to the Welfare and Institutions Code, and directly connected with and limited to the administration of public social services."

tributes it to the county welfare departments for comparison with earnings disclosed to them by recipients.[3] In announcing the System, the DSW publicly stated that the purpose of the System is to determine the amount of unreported earnings of AFDC recipients, to deter fraud, and to save public funds.[4]

Upon the complaint of the Golden Gate Welfare Rights Organization, Inc. (hereinafter, "Golden Gate"), proceedings were had in superior court which culminated in respondent court's issuance of a modified preliminary injunction on March 2, 1972. The injunction restrained the Director of the DSW from acquiring information from the DHRD regarding the earnings of any AFDC recipient except in "unusual circumstances" or in cases where the recipient had given his prior consent. Distribution of earnings information obtained by using the System was similarly restrained. The Director was also forbidden to obtain such information in cases where the evidence of earnings supplied to the DSW or to the particular county welfare department by the recipient himself was sufficient to determine his eligibility. After respondent court denied the Director's motion to vacate the injunction, the Director petitioned this court for a writ of prohibition or mandate. Since all pertinent issues can be thereby disposed of, we treat the petition as being one for mandamus. The public interest in a speedy determination of the issues makes the remedy appropriate. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 675 [94 Cal.Rptr. 279, 483 P.2d 1231].) We issued an order to show cause and temporarily stayed the preliminary injunction.

---

[3]In an affidavit submitted to the superior court (see opinion text, *infra*), the deputy director of the DSW explained that *all* the earnings information provided by the DHRD is distributed by the DSW to the county welfare departments; that each county "is expected to investigate and take whatever action is necessary" with respect to those AFDC recipients who were eligible during all three months of the second prior quarter and whose income was at least $610 in that quarter and fell within "the upper ten percent of earnings" thus reported by the DSW to that county; and that, as to those recipients who were eligible less than all three months of the second prior quarter or whose earnings "fell into the 0 through 90 percentile range" in that quarter (or, inferentially, were less than $610), the earnings data is distributed to the counties "for information."

[4]The amount of a recipient's income affects not only his eligibility but also the amount of his AFDC payment. (Welf. & Inst. Code, §§ 11267, 11450.) Where overpayment results from incomplete or incorrect reports of earnings, the DSW is empowered under certain conditions to recover the overpayment by reducing current grants or suing for restitution. (Welf. & Inst. Code, § 11004.) Section 11482 of the Welfare and Institutions Code provides that "Any person other than a needy child, who willfully and knowingly, with the intent to deceive, makes a false statement or representation or knowingly fails to disclose a material fact to obtain aid, or who, knowing he is not entitled thereto, attempts to obtain aid or to continue to receive aid to which he is not entitled, or a larger amount than that to which he is legally entitled, is guilty of a misdemeanor." (See, *People* v. *Gilbert* (1969) 1 Cal.3d 475 [82 Cal.Rptr. 724, 462 P.2d 580].)

States are not required to participate in the AFDC program, but once a state chooses to join it and take advantage of the substantial federal resources available, the state must comply with the mandatory requirements established by the Social Security Act, as interpreted and implemented by regulations promulgated by the United States Department of Health, Education and Welfare (hereinafter, "DHEW"). (*King* v. *Smith* (1968) 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125, 88 S.Ct. 2128, 2133]; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 738-739 [97 Cal. Rptr. 385, 488 P.2d 953].)

Golden Gate's contention—in the trial court and in the proceeding before us—is that the System violates DHEW regulations codified in 45 C.F.R. § 206.10(a)(12), which provides as follows:

"(12) In determining initial and continuing eligibility:

"(i) Applicants and recipients will be relied upon as the primary source of information in making the decision about their eligibility.

"(ii) The agency [DSW] will help applicants and recipients provide needed information, as necessary, or will obtain the information for them if, because of physical, mental, or other difficulties, they themselves are unable to provide it.

"(iii) Verification of circumstances pertaining to eligibility will be limited to what is reasonably necessary to ensure the legality of expenditures under this program.

"Under the requirements of this subparagraph:

"(*a*) The agency takes no steps in the exploration of eligibility to which the applicant or recipient does not agree. It obtains specific consent for outside contacts, gives a clear explanation of what information is desired, why it is needed, and how it will be used [Golden Gate and the Director refer to this provision as the *"collateral consent rule"*];

"(*b*) If other procedures are followed in an exceptional situation, they are consistent with

subparagraph (10) of this paragraph [which requires that standards and methods for determining eligibility must respect the applicant's or recipient's constitutional, statutory, and civil rights, and must not harass him or violate his privacy and personal dignity], and the case record specifies what procedures were followed and why they were needed;

"(c) When information available from the applicant or recipient is inconclusive and does not support a decision of eligibility, the agency explains to the individual what questions remain and how he can resolve or help to resolve them, what actions the agency can take to resolve them and the need for their resolution if eligibility is to be established or reconfirmed. If the individual is unwilling to have the agency seek verifying information, the agency, unable to determine that eligibility exists, denies or terminates assistance;

"(d) If a simplified method is used in the determination and redetermination of eligibility, the requirements of § 205.20 of this chapter apply."[5]

Golden Gate's theory (substantially accepted by respondent court) is, *first,* that the System's "dragnet" character—i.e., its universal application to *all* AFDC recipients of age 16 or older—is contrary to the import of the above regulations that verifying information be obtained from "outside contacts" only in limited cases of necessity, i.e., "[w]hen information available from the applicant or recipient is inconclusive and does not support a decision of eligibility . . ."; and, *second,* that the System violates the collateral consent rule embodied in 45 C.F.R. § 206.10(a)(12)(iii)(a), quoted *supra.*

Golden Gate asserts that the pivotal issue in this case is "the fair meaning of federal regulations [45 C.F.R. § 206.10(a)(12), *supra*] which place exact and narrow restrictions upon [the Director's] conduct." In memo-

---

[5]The parties stipulated in superior court that the "simplified method" of determining eligibility—referred to in 45 C.F.R. § 206.10(a)(12)(iii)(d), *supra*—is not used in this state. "The simplified method means an organized method by which the agency *accepts the statements of the applicant for, or recipient of assistance,* about facts that are within his knowledge and competence . . . as a basis for decisions regarding his eligibility and extent of entitlement." (45 C.F.R. § 205.20(c).) (Italics added.)

randum opinions which preceded the injunction, respondent court similarly viewed the problem as one of interpretation. The court rejected (and properly so) the Director's contention that the System is simply a means of "quality control" coming within the "exceptional situation" language of 45 C.F.R. § 206.10(a)(12)(iii)(*b*), *supra*.[6] In response to the Director's argument that authority for the System is found in 45 C.F.R. § 235.110(a)(1), which requires the DSW to establish and maintain "[m]ethods and criteria for identifying situations in which a question of fraud in the [AFDC] program may exist," the court concluded that identification of possible fraud is "inextricably linked" to the determination of initial and continuing eligibility, and is therefore subject to 45 C.F.R. § 206.10(a)(12), *supra*.

The crux of respondent court's decision to issue the injunction was its interpretation that, within the meaning of the collateral consent rule (45 C.F.R. § 206.10(a)(12)(iii)(*a*), *supra*), "outside contacts" include *other executive departments of the state government*.[7] As an interpretive guide, the court quoted 45 C.F.R. § 205.50, which imposes upon the DSW strict prohibitions against disclosure of information in *its* files, and which further requires that "The same policies are applied to requests for information [received by the DSW] from *a governmental authority, the courts,* or a law enforcement official as from any other outside source" (45 C.F.R. § 205.50(a)(2)(v)). (Italics added.) Without distinguishing situations in which the two agencies are both agencies of the *same* state government (let alone of the same branch of government), respondent court held that "Translated into English this [quoted regulation] means that one agency's request for information from another agency is on the same footing as a request from the general public."

There was a paucity of prior administrative interpretation of the federal regulations to assist respondent court.[8] The court was unimpressed with

---

[6]Under applicable federal standards, "quality control" involves a *sampling*. (45 C.F.R. § 205.40.) The System does not.

[7]In the proceeding before us, the Director does not take issue with respondent court's conclusion that the fact that the DSW and the DHRD are both departments within the state Human Relations Agency is of no relevance in applying the collateral consent rule, since the DSW and the DHRD are clearly separate agencies for purposes of administering their respective programs under federal and state law.

[8]The DHEW filed with respondent court an *amicus* brief supporting the System; and the Director relied also upon a telegram from the Secretary of the DHEW likewise reflecting the Secretary's opinion that the System does not conflict with regulations promulgated by his department. Those DHEW materials did not constitute a binding administrative interpretation of the regulations. (See, *Clemons* v. *United States* (6th Cir. 1957) 245 F.2d 298, 301.)

the Director's reliance upon part IV, section 2400, of the DHEW's "Handbook of Public Assistance Administration,"[9] which provides in relevant part that "Reliance on applicants and recipients as the primary source of information . . . will enable the agency to determine initial or continuing eligibility in a large percentage of cases on the basis of information provided by the individual, supplemented, *if necessary,* by information from *public records (i.e., records of a public agency).*" (Italics added.) Apart from the fact that the Handbook's reference to "public records" applies only in cases where it is "necessary," respondent court was of the view that, absent a definition of "public records" in the DHEW's *regulations,* records of a public agency (here, the DHRD) which are *unavailable for public inspection* are not excluded from the collateral consent rule.[10] (See fn. 2, *supra.*)

Taking note that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen" (*Service* v. *Dulles* (1957) 354 U.S. 363, 372 [1 L.Ed.2d 1403, 1410, 77 S.Ct. 1152, 1157]), respondent court drew support from the fact that, when a similar Earnings Clearance System was put into effect in Nevada in 1970, the DHEW disapproved it in a report which emphasized that "Prior authorization to contact collateral sources of information was not secured in accordance with Federal policies." The DHEW report on the Nevada procedure, however, did not define the "collateral sources" which it mentioned; the report showed that the Nevada AFDC agency had consulted "other individuals or . . . other agencies or firms" *in addition to* obtaining earnings information from the Nevada Employment Security Department.

 It is unnecessary, nonetheless, for us to determine whether respondent court correctly interpreted 45 C.F.R. § 206.10(a)(12), since we are of the opinion that, on its face, said regulation does not apply to the System inaugurated in California. In our view, respondent court erroneously equated the DSW's function "[i]n determining initial and continuing eligibility" (of which said regulation speaks) with the DSW's duty to establish and maintain "[m]ethods and criteria for identifying situations in which a question of fraud in the program may exist" (45 C.F.R. § 235.110(a)(1)).

---

[9] We have neither found nor been cited to any authority which indicates that the contents of the "Handbook of Public Assistance Administration" have the status of federal regulations. The Director and Golden Gate treat the Handbook merely as containing material *interpretive* of the DHEW's regulations.

[10] Under the "simplified method" for determining eligibility (fn. 5, *supra*), federal regulations permit verification by resort to "public records" without the individual's knowledge or consent (45 C.F.R. § 205.20(a)(3)), but do not define "public records."

Golden Gate's argument—substantially agreed with by respondent court —does not take into account the significance of the fact that, in its operation, the System obtains earnings information approximately six months old only for persons (16 years of age or older) who received AFDC payments *six months prior to the time the DHRD supplies the information to the DSW*. In short, the System looks to AFDC payments six months in the past, whereas 45 C.F.R. § 206.10(a)(12) looks to AFDC payments yet to be received. It is provided in 45 C.F.R. § 206.10(a)(3) that "A decision will be made promptly on applications, pursuant to reasonable State-established time standards not in excess of 30 days for . . . AFDC"; 45 C.F.R. § 206.10(a)(6) specifies that "Entitlement will begin as specified in the State plan, which (i) for financial assistance must be no later than the date of authorization of payment and, for the purposes of Federal financial participation, may be as early as the first of the month in which an application has been received and the individual meets all the eligibility conditions"; and 45 C.F.R. § 206.10(a)(9)(ii) provides that, where an individual has been determined to be eligible, eligibility will be reconsidered or redetermined "Promptly, within 30 days, after a report is obtained which indicates changes in the individual's circumstances may affect the amount of assistance to which he is entitled or may make him ineligible . . . ."

Insofar as it refers to the verification of eligibility information, 45 C.F.R. § 206.10 addresses itself only to *future* payments.[11] The reliance which 45 C.F.R. § 206.10(a)(12)(i) places upon the applicant or recipient as "the primary source of information," and the restrictions imposed by the collateral consent rule, are singularly appropriate to futurity of payment, since 45 C.F.R. § 206.10(a)(12)(iii)(*c*) gives the applicant or recipient the option to minimize or avoid the consequences of fraud by its provision that "If the individual is unwilling to have the agency seek verifying information, the agency, unable to determine that eligibility exists, denies

---

[11]In contrast, Unemployment Insurance Code section 1095, subdivision (e)— quoted in footnote 2, *supra*—contains no language confining its application to *future* "public social services." Golden Gate has drawn our attention to a recent law review article, *The Welfare Reform Act of 1971*, co-authored by one of the state senatorial co-authors of subdivision (e). (3 Pacific L.J. 475 (1972).) The article is cited for the proposition that access to relevant information is allowed by subdivision (e) only "in those individual cases where there is substantial reason to suspect welfare fraud" and that "exploratory searches" are not thereby authorized. Although the article uses such language of limitation (p. 491), subdivision (e) does not; and the unofficial law review material, published long after the enactment of the subdivision, cannot be considered as a statement of legislative intent. (*In re Lavine* (1935) 2 Cal.2d 324, 327 [41 P.2d 161, 42 P.2d 311]; see also, *Takahashi* v. *Fish and Game Com.* (1947) 30 Cal.2d 719, 732 [185 P.2d 805], revd. on other grounds (1948) 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138].)

or terminates assistance . . . ." Such option is meaningless as to AFDC payments already received (here, six months earlier).

We hold, therefore, that the System is not within the intendment of 45 C.F.R. § 206.10(a)(12); that the System violates no provision of federal or state law which has been cited to us by Golden Gate; and that the System was established and is maintained as a method "for *identifying* situations in which a question of fraud in the program *may* exist" (45 C.F.R. § 235.110(a)(1)).[12] (Italics added.)

Nor do we find a semblance of merit in Golden Gate's suggestion that the System subjects AFDC recipients to harassment, invasions of privacy, unlawful search and seizure, or other unconstitutional infringement. In this connection, Golden Gate relies heavily upon *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260 [57 Cal.Rptr. 623, 425 P.2d 223]; but there is a substantial distinction between "a mass morning raid upon the homes of the county's welfare recipients," as in *Parrish* (*id.* at p. 262), and resort by the executive branch to its own records in the case at bench.

In the absence of statutory or regulatory restriction, we find in the present case no impediment to the power of executive departments of the state government to share information which they have properly obtained. (See, *Abel* v. *United States* (1960) 362 U.S. 217, 240 [4 L.Ed.2d 668, 687, 80 S.Ct. 683, 698]; *Bank of America Nat. Trust & Sav. Ass'n* v. *Douglas* (D.C.Cir. 1939) 105 F.2d 100, 104 [70 App.D.C. 221, 123 A.L.R. 1266].) We have proceeded on the premise that the vast majority of AFDC recipients (including Golden Gate's members) are honest,[13] and that, as honest persons, they believe it to be eminently fair—and simply common sense—for the executive branch of the State of California to verify the legality of past AFDC payments by recourse to information which it has lawfully acquired and which is lawfully available for that purpose. Neither sound business practice nor the law demands less care if public confidence in the AFDC program is to be maintained.

The order to show cause is discharged. Let a peremptory writ of man-

---

[12] 45 C.F.R. § 235.110 further requires the state agency administering AFDC to establish procedures for the investigation and referral to law enforcement officials of situations in which "there is" a question of fraud. (Subds. (a)(2) and (b).) In contrast, as quoted in text above, the preliminary identification of situations in which a question of fraud "may" exist is to be accomplished by methods which are not—and logically could not be—limited to *already* suspect cases. (45 C.F.R. § 235.110(a)(1).)

[13] Whether in fact there exists substantial fraud in the California AFDC program—a question much bruited by the parties in this proceeding—is irrelevant to our decision.

date issue commanding respondent court to set aside its modified preliminary injunction dated March 2, 1972, and to enter judgment that Golden Gate take nothing by its complaint.

Richardson, P. J., and Friedman, J., concurred.

A petition for a rehearing was denied August 22, 1972, and the petition of the real party in interest for a hearing by the Supreme Court was denied October 5, 1972. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.