**Carolyn HARNETT, Appellant,**

v.

**George A. ULETT et al., Appellees.**

**No. 71-1488.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1972.

Decided Aug. 22, 1972.

Louis Gilden, St. Louis, Mo., for appellant.

Kermit W. Almstedt, Asst. Atty. Gen., John C. Danforth, Atty. Gen., Jefferson City, Mo., for appellees.

Morris J. Levin, St. Louis, Mo., for National Assn. of Social Workers, Inc.

David Scribner, New York City, General Counsel for National Assn. of Social Workers, Inc. for amicus curiae.

Before VAN OOSTERHOUT, Senior Circuit Judge, and MEHAFFY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Carolyn Harnett, a former social worker and employee at the Malcolm Bliss Mental Health Center, a Missouri State hospital, appeals following an adverse *jury* decision in her 42 U.S.C. § 1983 action against two supervisors and the director of the hospital for unlawfully discharging her in retaliation for exercising her Constitutional rights of free speech. Harnett claims that the trial court erred in two respects: In dismissing from the complaint following motions for summary judgment the allegation that Harnett had been denied due process of law in that she was arbitrarily discharged from her employment without being afforded a pre-termination hearing; and that the trial court abused its discretion in excluding expert testimony regarding Harnett's conduct as it related to the ethical standards for social workers.[1] We affirm.

A brief review of the evidence is necessary. Carolyn Harnett received her Master of Social Work degree in June 1970, and became employed at the Malcolm Bliss Mental Health Center as a probationary employee on September 1. She was classified as a psychiatric social worker I and was eventually assigned to a treatment team in the children's inpatient service.

On September 18, 1970, Harnett conducted a social service interview with a 16 year-old female who was voluntarily committed to Malcolm Bliss at the request of her mother. The patient requested information on hospital release procedures, indicating a desire to leave.

The hospital's procedure manual, which was available to Harnett, provided for the release of voluntary patients within 48 hours following a written request for discharge to the Superintendent unless involuntary commitment proceedings are begun. Harnett phoned the local Legal Aid Society and inquired about the rights of her patient. That afternoon Harnett allowed the patient to use her office phone to call an attorney at the Legal Aid office. Shortly thereafter, Harnett permitted the attorney's entrance into the locked ward and enabled the attorney to interview the patient in her office. The procedure manual also provided specifically that lawyers, among others, may visit patients only with the permission of the supervising psychiatrist. Harnett was admonished for this incident by her superiors and instructed to review the hospital policies and to make use of her supervisors in the future concerning questions involving hospital policies and procedure.

On September 27, 1970, a minor incident occurred in which Harnett took the patient out of the hospital for a day albeit with permission from one of the resident doctors. Her supervisor informed her the next day that the "hospital frowned on this sort of thing."

Upon reaching the age of 17, the patient was moved to the adult ward and was no longer assigned to Carolyn Harnett. On October 20, Harnett was told by an occupational therapist that the patient had stated she was to receive "electric shock therapy" the next day and that she did not want it. Miss Harnett then called the Legal Aid Society for information relating to the legal rights of patients to refuse to undergo electroshock therapy. Two attorneys at Legal Aid responded to this request for information by going to the hospital to see the patient. The lawyers were informed that electroshock therapy had

---

1. The trial court granted summary judgment in favor of two of the defendants, the state director of the Division of Mental Diseases and the hospital's director of personnel. Motions for a directed verdict at the close of the evidence were granted in favor of the psychiatric director of inpatient services and the psychiatric director of children's services.

not yet been finally decided on and that in no event would it be given until the patient had given her consent. The patient's mother gave her consent to the therapy on October 19. The patient consented on October 21.

Carolyn Harnett was again admonished by her supervisor for impulsive conduct, acting without sufficient knowledge, usurping the responsibilities of the patient's new social worker and not availing herself of her supervisors. On October 22, Harnett was requested to resign and given thirty days to seek other employment. Miss Harnett refused. She was dismissed October 28, effective October 30. In a social service report completed on October 30, Harnett's supervisor rated her unsatisfactory to fair (71%).

In November 1970, Miss Harnett brought the action below claiming that on two occasions she had exercised her rights of free speech by making the phone calls to the Legal Aid Society. She asserted that by reason of her exercising her constitutional rights, she was discharged from employment at the hospital, praying for $50,000 actual and $50,000 punitive damages. The jury returned a verdict in favor of the appellees.

The trial court dismissed that portion of the complaint in which Miss Harnett claimed that she had been denied due process of law for the reason that *no reasonable grounds* existed for her discharge. She claims error, asserting that a public employee, though probationary, is entitled to a pre-termination hearing to insure that fundamental liberties are not lost.

We find two recent decisions of the Supreme Court of the United States controlling and affirm. In Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed. 548 (1972) a state university teacher who had been hired for a fixed term of one academic year was not rehired for the following year. Wisconsin law left the decision whether to rehire nontenured teachers to "the unfettered discretion of University officials." Roth alleged (1) that the true reason he was not rehired was that he was being punished for making statements critical of the school's administration, therefore infringing his rights of free speech and (2) that he had received no notice containing reasons for nonretention or a hearing, thereby violating his rights of procedural due process. The Seventh Circuit determined that due process required a statement of reasons for nonretention and a hearing to serve "as a prophylactic against non-retention decisions improperly motivated by exercise of protected rights." 446 F.2d 806, 810 (CA7 1971). The Supreme Court, Justice Stewart speaking, disagreed and said:

The requirements of procedural due process apply only to the deprivation of interests encompassed within the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite. 408 U.S. at 569, 92 S.Ct. at 2705.

The Court then proceeded to determine that absent some sort of statutory tenure or contractual rights, a public employee has no interest cognizable at law necessitating due process protection unless a showing is made that the governmental conduct likely will (1) seriously damage his standing and associations in this community, (2) impose a stigma upon the employee that will foreclose future opportunities to practice his chosen profession, or (3) constitutes an admittedly direct impingement upon the employee's free speech interest.

In Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), allegations virtually identical to those of Roth were made by an untenured college teacher employed for four successive years under a series of one-year contracts. Here the Court affirmed the Fifth Circuit's decision that due process

requires a hearing, 430 F.2d 939, 944 stating:

> The respondent's lack of formal contractual or tenure security in continued employment at Odessa Junior College, though irrelevant to his free speech claim, is highly relevant to his procedural due process claim. But it may not be entirely dispositive.

> We have held today in Board of Regents v. Roth, *ante,* that the Constitution does not require opportunity for a hearing before the nonrenewal of a nontenured teacher's contract, unless he can show that the decision not to rehire him somehow deprived him of an interest in "liberty" or that he had a "property" interest in continued employment, despite the lack of tenure or a formal contract. 408 U.S. at 599, 92 S.Ct. at 2698.

The Court affirmed on the basis that the teacher, albeit untenured, appeared to have a cognizable interest in continued employment on the basis of a de facto tenure program fostered by the college administration and legitimately relied upon by the tachers at the school.

 *Roth* and *Sindermann* adhere to the principle that absent contractual, legislative or constitutional provision on the subject, the power of removal is incident to the power of appointment, and government employment can be revoked at the will of the appointing officer. Matter of Hennen, 38 U.S. (13 Pet.) 225, 229, 10 L.Ed. 138 (1839). See Freeman v. Gould Special School District of Lincoln County, Arkansas, 405 F.2d 1153, 1159 (CA8 1969). This case therefore is governed by the rule.

Carolyn Harnett was hired as of September 1, 1970. Her letter of appointment stated that her appointment was being made "for a probationary period of six months, during which time [her] progress will be observed and evaluated." Under the merit system laws and regulations of Missouri, Harnett clearly was subject to provisions requiring her to be originally employed in a probationary status, subject to removal by the appointing authority upon a determination that she is "unable or unwilling to perform the duties of the position satisfactorily, or that [her] habits and dependability do not merit [her] continuance in the service." 3A V.A.M.S. § 36.250 (1969).[2] It is clear, therefore, that Miss Harnett possessed no statutory or contractual rights to continued employment. Nor is there any suggestion of a de facto tenure program or an implied promise to retain her for the duration of the probationary period or subsequent thereto. See *Sindermann, supra,* 408 U. S. 593, 92 S.Ct. 2694. Additionally, no allegation of a departure from the applicable discharge procedures is maintained by the appellant. See Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L. Ed.2d 1012 (1959).

In turn, there are no allegations of conduct by the hospital director or her supervisors which impugn Miss Harnett's reputation for honesty, integrity or morality which would necessitate a hearing in order to clear her name. Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U. S. 886, 898–899, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) and Wieman v. Updegraff, 344 U.S. 183, 190–191, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Similarly, Harnett's future employment opportunities to practice her chosen profession as a social worker were not alleged to have

---

2. 3A V.A.M.S. § 36.250 reads, in pertinent part:

1. Every person certified and appointed to a permanent position subject hereto shall be required to complete successfully a working test during a probationary period which shall be of sufficient length to enable the appointing authority to observe the employee's ability to perform the various principal duties pertaining to the position. * * * At any time during the probationary period the appointing authority may remove an employee if, in the opinion of the appointing authority the working test indicates that such employee is unable or unwilling to perform the duties of the position satisfactorily, or that his habits and dependability do not merit his continuance in the service.

been foreclosed by the conduct of her superiors. *Roth, supra,* 408 U.S. 564, 92 S.Ct. 2701 (and cases cited therein). Nor shall we presume she has been so stigmatized. *Roth, supra,* 408 U.S. 564, 92 S.Ct. 2701. In fact, Miss Harnett was soon employed in her profession at a salary substantially higher than she had received at Malcolm Bliss.

Finally, this is not a case where there has been an overt and direct attack upon a public employee for engaging in protected First Amendment activities. See, *e. g.,* Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L. Ed.2d 629 (1967); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) and Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957). Compare, Jenson v. Olson, 353 F.2d 825 (CA8 1965) with Donahue v. Staunton (CA7 July 6, 1972). The trial court submitted to the jury the question of whether appellant's dismissal was in retaliation for her exercising her rights of free speech in making the two phone calls to the attorneys at the Legal Aid Society in behalf of the patient. The jury's verdict was adverse to her claim. We note also, that the rules set forth in the hospital's procedure manual which she violated by her conduct were not attacked as unreasonable or arbitrary when weighed or balanced against her First Amendment rights.

 Miss Harnett also asserts that the trial court abused its discretion by excluding the testimony of three social work educators.

The trial court, after expressing reluctance on the basis of irrelevancy, admitted into evidence the Code of Ethics adopted by the National Association of Social Workers and an article entitled "The Social Worker as Advocate: Champion of Social Victims." See 14 Social Work 16–22 (1969). The first statement of the Code to which NASW members subscribe reads, "I regard as my primary obligation the welfare of the individual or group served, which includes action for improving social conditions." The article concerning advocacy by social workers is a forceful statement to the effect that social workers have a professional obligation to become an advocate for the rights (including civil rights) of their client, even when this obligation would place them in conflict with their employers. Miss Harnett, though not a member of the NASW, testified that she subscribed to this principle of the Code of Ethics.

The appellant then attempted to introduce the testimony of three professors of social work. Their testimony would have been that in their opinion, the phone calls made by Harnett to the Legal Aid Society was conduct in conformance with her professional responsibilities as a social worker and as required by the Code of Ethics. The trial court excluded this testimony for the stated reason that (1) it invaded the province of the jury, (2) no clearcut standards exist as to which an expert could testify, and (3) it was the expression of a personal opinion rather than that of an expert. Prior to the formal offer of proof the trial court expressed concern "about whether this is properly the subject for opinion testimony."

A trial judge is vested with wide discretion in determining whether to admit or exclude expert testimony. His determination of whether such expert testimony is necessary under the circumstances of a particular trial is to be sustained unless manifestly erroneous. White v. United States, 399 F.2d 813, 819 (CA8 1968); Lowe v. Taylor Steel Products Co., 373 F.2d 65 (CA8 1967); Idzojtic v. Pennsylvania Railroad Co., 456 F.2d 1228 (CA3 1972) and Bridger v. Union Railway Co., 355 F.2d 382 (CA6 1966). See also Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L. Ed.2d 313 (1962). In addition, a trial court will not be reversed upon any evidentiary ruling unless the error is shown to be prejudicial. *White, supra,* 399 F. 2d at 819 (and cases cited therein).

We are satisfied that the trial court's exclusion of this testimony was not an abuse of discretion. In addition, a full review of the record convinces us that the exclusion was not prejudicial.

Affirmed.