Burton R. GALAWAY, Plaintiff,

v.

Thomas LAWSON, Individually and as Projects Coordinator, Minnesota Department of Corrections, Kenneth F. Schoen, Individually and as Commissioner, Department of Corrections, and Patrick Mack, Individually and as Deputy Commissioner, Department of Corrections, Defendants.

No. 4–74 Civ. 111.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 1, 1976.

# MEMORANDUM OPINION

ROSS, Circuit Judge, By Designation.

Burt Galaway, former director of a Minnesota corrections program known as the Minnesota Restitution Center, brought this 42 U.S.C. § 1983 claim based on his dismissal from the directorship, naming three defendants. They are Kenneth F. Schoen, Commissioner of the Minnesota Department of Corrections, Patrick Mack, Deputy Commissioner, and Thomas Lawson, Projects Coordinator of the Department of Corrections.[1]

The plaintiff has presented evidence and arguments on several legal theories, alleging the violation of his constitutional rights in the dismissal from his post. In this court's view, however, the evidence does not warrant the relief the plaintiff has requested, and the claims will be denied.

The Minnesota Restitution Center is a correctional facility funded by a grant through the Governor's Commission on Crime Prevention and Control and is supervised by the Department of Corrections. The purpose of this correctional facility is to test the effectiveness of a halfway house coupled with the concept of restitution as a rehabilitative tool in comparison to traditional prison incarceration. It was also a goal of the Center, as a community corrections facility, to improve community attitudes toward corrections. The program from its inception was experimental in nature. The population for the experiment was drawn from the Minnesota State Prison system.

A set of objective criteria was established for the program[2] and as new inmates en-

Randall D. B. Tigue, Minneapolis, Minn., for plaintiff.

Warren Spannaus, Atty. Gen., Peter W. Sipkins, Sol. Gen., Richard G. Mark, Gilbert S. Buffington, Sp. Asst. Attys. Gen., St. Paul, Minn., for defendants.

1. This order apparently represented the chain of command, with Galaway reporting to Lawson, the Projects Coordinator.

2. The original grant request did not contain the eligibility criteria. The criteria were generated later. However, a "Project Plan" included in the original grant application stated that "[t]he population mix envisaged is one of 50% male and 50% female." This was later changed without Crime Commission approval so that only men participated.

The criteria arrived at and approved in the summer of 1972 required: solely adults; those who had committed crimes in the "seven-county metropolitan" region; all present offenses were property offenses; all offenders had five years of community living prior to commitment without conviction of a crime against the person; all offenders did not have detainers filed or "very likely to be filed" against them; "parole violators," returned as such, would be ex-

tered the prison each file would be checked against these requirements.[3] Those inmates meeting the criteria became the pool for the random selection process. The random numbers, in accordance with the scientific design, divided the pool into "experimental" and "control" groups. The control group remained in prison; the experimental group attempted to make restitution to their victims. Those chosen for the program lived in a halfway house, the Minnesota Restitution Center. The staff of the Center helped the individuals contact their victims and negotiate contracts providing for monetary or at least symbolic restitution to the victim.

The negotiated contracts were then submitted to the Adult Corrections Commission, a parole board, and the Board made the final decision as to whether a particular individual was to be paroled and released to the Restitution Center. The Board's discretion, and the prisoner's right to refuse to participate even if he were randomly chosen, were both deviations from a strictly experimental approach.

If a prisoner fulfilled the contract, he was considered a successful participant. At the time of Burt Galaway's dismissal as director, approximately 44 persons had been placed in each of the two groups.[4] Only about three persons had then been denied parole to the Center by the paroling authority.

The first residents came to the Center, which was housed in the Minneapolis YMCA, in September 1972. At that time its first director was Joe Hudson. Hudson's stay was short, and in March 1973 Galaway approached Commissioner Schoen concerning the vacancy in the director's post. He then discussed employment with Mr. William Milliken, who was Regional Director for Adult Services. In March 1973 Galaway was interviewed by a special screening committee which had been established to screen applicants for the post and to make its recommendations to Milliken;[5] Galaway was recommended by the Committee and Milliken hired him to begin work as director in July 1973.

The controversy which led to Galaway's eventual dismissal arose in October 1973. The center of the controversy was James Freeman, Jr., a new prison admittee who had been placed on probation originally but was sentenced to five years when his probation was violated. His alleged large fencing operation in stolen merchandise had been widely publicized in the Minneapolis area. Freeman, who was randomly selected for the Restitution Center program, was believed to meet the established criteria.[6]

cluded. A chart showing the method of operation and the criteria were made available to Schoen after they were developed.

These criteria were substantially the same criteria included in the second year grant application to the Crime Commission. The "parole violator" criteria was not listed, though the testimony of Hudson and Galaway indicates it was still applied in practice. Grants to the Restitution Center were made on a year-by-year basis.

3. A graph attached to the First Quarterly Report on the program to the Crime Commission indicates that the prison staff applied the criteria to the information in incoming files. The Restitution Center staff later took over this function to relieve the prison staff's workload. This change was made on an informal basis, without Crime Commission approval.

4. Termination of the randomization process was anticipated at some point. The October 1973 Quarterly Report from Galaway states that by the end of the second year "fifty to seventy-five men will have been selected" so that reliable generalizations from the experiment could be made. A June 28 memo from Hudson predicted that the "use of random assignment procedures could be dropped once approximately fifty residents had completed the program."

5. The committee was composed of Restitution Center staff, residents, and members of the Restitution Center Advisory Board. It is stipulated that the screening committee's capacity was advisory only, and that they had no authority to establish any of the terms and conditions of employment for the new director.

6. At one point it appeared that a subsequently filed detainer would take Freeman out of the experimental group. It was, however, "worked out" prior to Freeman's scheduled appearance before the parole board. The *probation* violation apparently did not come within the *parole* violation criteria although it is difficult to understand why it did not.

Galaway anticipated an adverse reaction to Freeman's inclusion and informed top management in the Corrections Department, including Schoen and Mack, of Freeman's eligibility.[7] In mid-November when Freeman was randomly placed in the experimental group Galaway and an associate began an active campaign to inform and explain Freeman's inclusion to local law enforcement personnel. Galaway told Lawson of these briefings and Lawson indicated he would "get back" to him.

In early December Galaway was informed by Lawson that upper management wished that Freeman not be allowed to submit a restitution contract for consideration by the parole board. The reason the defendants gave was their concern that adverse public reaction to the program itself would develop and a belief that Freeman and other professional criminals were inappropriate participants. Galaway, and particularly his staff, were adamantly opposed to this position. Numerous meetings were held by the Advisory Board, staff and management throughout December without a resolution of the argument.[8] On January 2, 1974, a memorandum from Lawson to Galaway ordered Galaway and the staff not to submit Freeman's name. Galaway responded on January 7 with his refusal to follow that order. On January 9 his employment was terminated.

It is stipulated that on both January the 8th and the 9th, prior to termination, and on January 11, subsequent to termination, Galaway was given the opportunity to change his position and retain or regain his job. He refused. It is agreed by the parties that Galaway's refusal to follow the Department's order was the reason for his dismissal.

Freeman later took his own case against the state to court. In *Freeman v. Schoen,* 370 F.Supp. 1144 (D.Minn.1974) Judge Larson issued a temporary restraining order against the Department of Corrections. The court found that Freeman's exclusion from consideration by the parole board, though he conformed to the stated criteria, was a denial of due process. No appeal was taken and as a result, Freeman's name was submitted to the parole board which promptly rejected his request. The criteria for the Restitution Center was later changed to exclude professional-type criminals.

## SUBSTANTIVE DUE PROCESS

The plaintiff has made three principal[9] claims, all based on alleged due process violations. The first to be considered here is the plaintiff's substantive due process claim.

Galaway has contended that he was fired for refusing to obey an order which resulted in the violation of a third party's protected rights. Firing him for refusing to obey that kind of order, Galaway argues, was itself constitutionally infirm. This claim, based as it is on an alleged constitutionally impermissible reason for dismissal from public employment, is basically one of substantive due process.

■ It is well established that a public employee may not be fired for the exercise of his own specific constitutional rights.

---

7. In an affidavit in Freeman's court case, Galaway, referring to this approximate time stated: "I * * * was having some concern about the potential community reaction and was considering the possibility of requesting, from the Crime Commission, an exception to our selection procedures."

8. In an Advisory Board meeting on the issue the Board voted 5–4 not to exclude Freeman. In another meeting Galaway met with all three defendants where viewpoints were exchanged. At one other meeting Lawson met with the Restitution Center staff and discussed the Department's position. At that last meeting, it

was indicated that an order to the staff, with sanctions for refusing to follow it, might be forthcoming.

9. The plaintiff also tangentially makes a first amendment claim. However, no evidence was presented which indicated that plaintiff was dismissed in retaliation for exercising his free speech rights. *Frazier v. Curators of University of Missouri,* 495 F.2d 1149, 1153 (8th Cir. 1974). The parties have even stipulated that the reason for plaintiff's termination was his refusal to follow the Department's directive of January 2, 1974.

Particularly is he protected when exercising his first amendment rights of speech and association, his fifth amendment privilege against self-incrimination, or when he is dismissed for reasons of racial bias.[10]

The plaintiff, however, is not here asserting the violation of his own rights. The reach of substantive due process in this circuit was defined in the opinion *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196 (8th Cir. 1974). In that case a nontenured North Dakota teacher was not rehired after seven years of employment. Ms. Buhr claimed, *inter alia,* that her rights to substantive due process had been violated because the reasons cited for her dismissal were "totally unsupported by factual evidence." *Id.* at 1200. The court identified two lines of cases concerning substantive due process in the Eighth Circuit:

> The first would condition the right to federal judicial review of allegedly arbitrary state action upon a showing that a specific constitutional right has been infringed, such as deprivation of freedom of speech, racial discrimination or denial of procedural due process rights where liberty or property interests are at stake. The other line of cases seems to suggest that substantive due process is a specific constitutional right in itself, cognizable under 42 U.S.C. § 1983 and violated whenever a state acts to the detriment of an individual in a manner that is arbitrary or capricious. (Footnotes omitted.)

*Id.* at 1201. The court then held, relying heavily on an opinion of Judge Stevens, then on the Seventh Circuit,[11] that a plaintiff's freedom from arbitrary decision-making did not become actionable unless she also had a right to *procedural* due process because of a protected property or liberty interest. As a result, a plaintiff can only

allege the capriciousness of a given reason if she also has a right to a *hearing* on the dismissal. *Id.* at 1202–1203. The plaintiff here was not fired for exercising his own specific constitutional rights, and as will be later discussed, had no procedural due process protections.

Galaway's case does not come within the delineations described in *Buhr,* nor is the substantive due process claim supported by the plaintiff's cited legal authority. The opinion in *Parrish v. Civil Service Commission,* 66 Cal.2d 260, 57 Cal.Rptr. 623, 425 P.2d 223 (1967), even assuming its legal significance for this court, only approximates the present case. In *Parrish,* a social worker protested his discharge for "insubordination" when he refused to carry out an early morning warrantless raid on the homes of welfare recipients. In reversing the employee's discharge, the California court pointed to uncontradicted evidence in the record that the employee refused to obey the order because he believed he would be violating the recipient's rights. *Id.* at 275, 57 Cal.Rptr. at 633, 425 P.2d at 233. The court carefully reserved the question of an employee's rights where he had not so believed or where reasonable grounds to believe in a constitutional violation did not exist. *Id.* at 276, 57 Cal.Rptr. at 634, 425 P.2d at 234.

On this distinction in the evidence alone the plaintiff's claim may be denied. It is clear from the testimony and from the submitted exhibits that Galaway did not challenge the defendant's order in an attempt to protect Freeman's constitutional rights. His refusal in fact had little or nothing to do with Freeman as an individual. In the January 7 memo rejecting the Department's order, Galaway listed the reasons for

---

10. *See, e. g., Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Slochower v. Board of Educ.,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

11. *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 4 (7th Cir. 1974) states: As *Roth,* [*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548] squarely holds, the right to procedural due process is

applicable only to state action which impairs a person's interest in either liberty or property. Certainly the constitutional right to "substantive" due process is no greater than the right to procedural due process. Accordingly, the absence of any claim by the plaintiff that an interest in liberty or property has been impaired is a fatal defect in her substantive due process argument. (Footnote omitted.)

his refusal. First he stated that following the order might place him in violation of the Crime Commission grant; secondly, he stated that "political sensitivity" should not be a controlling factor in corrections decisions; thirdly, he argued that while there was room for professional disagreement on the matter, the parole board was the appropriate group to determine Freeman's eligibility.

The weight of the evidence at trial, including the newspaper exhibits, supports the conclusion that preserving the staff's morale and the validity of the research plus concern about the precedent of Department intervention, were Galaway's *primary* concerns. There is no competent evidence that Galaway was aware of or motivated by possible *constitutional* consequences for the prisoner Freeman.[12]

Nor can Galaway successfully seek reinstatement by alleging that he disobeyed the order because of a possible violation of the terms of the Crime Commission grant.[13] It is clear that other deviations from the grant had taken place prior to the Freeman incident with Galaway's knowledge and approval.[14] Galaway also admitted that the defendant Schoen, who was himself a member of the Crime Commission, would be responsible to the Commission for any action taken. Mr. Dale Parent, who reviewed and recommended grant applications to the Crime Commission, testified that he was primarily concerned that projects comply with the goals, and that virtually every grant underwent some changes. Mr. Parent never took any action to have the Restitution Center grant terminated.

It is clear that Burt Galaway and other management in the Department of Corrections had a major disagreement on how to proceed when Freeman's name arose. Lawson had afterwards described it as a "professional disagreement," and Galaway has conceded that the Department's opinion that Freeman was an inappropriate candidate for community corrections was valid. When Galaway refused to follow an order reflecting that policy, he was dismissed. The court is unable to conclude, based on this record, that Galaway's dismissal was constitutionally impermissible.

## PROCEDURAL DUE PROCESS

The plaintiff has alleged that he has been deprived of his liberty and property without due process of law because he was not afforded notice and hearing prior to his dismissal. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) requires due process safeguards when a constitutionally protected liberty or property interest has been implicated.

Galaway has urged that his standing and reputation in the community were seriously damaged when his name was publicly aligned with Freeman "one of the most notorious criminals in the State of Minnesota." The court must reject this somewhat distorted view of the evidence.

It is clear that Galaway was told to leave the director's post solely because he refused to obey an order from his immediate super-

12. Galaway never expressed concern to Lawson, his immediate supervisor, about Freeman's constitutional rights. At the trial Galaway testified that one additional reason he had was that he felt it was "unfair" to make an individual exception to the published criteria. This justification does not appear to be a primary motivation.

13. In his memorandum of January 7 Galaway gave this as a reason and stated: "[F]ollowing through on the determination noted in your memorandum would force us to operate inconsistent with the grant, and, possibly, illegally." At trial, Galaway interpreted this phrase in his memorandum as a reference to the program's rigorous, experimental design, the eligibility

criteria, and the unfairness of leaving an individual out of the program. Galaway had no "direct" knowledge that the defendant's proposed decision would have violated the grant terms.

14. As earlier stated, the population in the experiment was changed to exclude women. Galaway also testified that he was considering including men from the *St. Cloud Reformatory* on a *non* random basis without amending the grant and perhaps had received some men from there not randomly selected. It is also clear that the end of randomization in the program was foreseen.

visor. However, in *Roth, supra,* 408 U.S. at 573, 92 S.Ct. 2701 the Court listed charges of dishonesty and immorality as sufficiently serious to evoke a liberty interest. In *Harnett v. Ulett,* 466 F.2d 113 (8th Cir. 1972), a social worker had been admonished on several occasions for failure to follow written procedures and for acting without the advice of superiors. She was eventually dismissed. The court found no liberty interest because the hospital had made no allegations which "impugn Miss Harnett's reputation for honesty, integrity or morality * * *." *Id.* at 117.[15]

In the present case, Lawson had described the dispute in the press as a "legitimate professional disagreement" but added that "when it comes to refusing absolutely to follow a directive, you don't have many alternatives." Galaway told the press the same day that he had no "animosity toward the corrections department, or against Tom [Lawson]."

Moreover, Galaway's position on the controversy was frequently repeated and explained in the media; his name was not characterized or associated with Freeman's alleged criminality by the press or the defendants. Galaway's position was variously explained in the news as necessary to maintain the integrity of the research and to avoid a grant violation.

The evidence also did not indicate a "stigma" which would foreclose prospects for reemployment opportunities. *See Harnett v. Ulett, supra,* 466 F.2d at 118; *Cato v. Collins,* 539 F.2d 656, 660 n. 4 (8th Cir. 1976). It is stipulated that the plaintiff "secured gainful employment" after his termination at the Minnesota Restitution Center. In fact, he was employed in the first job he applied for, his former university teaching position.

Finally, even assuming a liberty interest was indicated, it is apparent that the plaintiff himself voluntarily publicized the dis-

missal. In a recent opinion of the Supreme Court, *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) the Court found that a policeman's discharge did not provide him with an automatically protected liberty interest when the reasons for dismissal were communicated orally to the policeman and were not made public by the employer. *Id.* at 347, 96 S.Ct. 2074.

Similarly, in a recent opinion of the circuit court, *Cato v. Collins, supra,* 539 F.2d at 660, no infringement of the liberty interest was found when the reasons for the employee's dismissal were announced only after the *employee* requested *public* hearings. Galaway testified at trial that it was likely, though he was not sure, that he himself first told the press of his firing. Though he initiated no calls, he spoke freely to the press about Freeman and the dismissal when he was contacted. He was, as the news articles reflect, a voluntary spokesman on the incident.

■ In view of the nature of the charge against Galaway and the diminutive adverse impact on his good standing and reputation, this court can find no liberty interest which requires procedural protection.

■ The "property" claim Galaway makes must also be rejected. It is stipulated by the parties that the plaintiff had no written contract with the defendants or the Department of Corrections concerning his employment as director of the Minnesota Restitution Center. It is also stipulated that the employee application for the director's position did not specify a minimum or specific time period of employment as director. In any event, an employee's claim to entitlement must be determined by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 343, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Under Minnesota law Galaway was an unclassified state employee because the director's post he held was itself an unclassi-

---

15. It is stipulated that the plaintiff was not charged with sex discrimination, racial discrimination, incompetence, theft or criminal or moral misconduct in connection with his termination.

At trial Galaway acknowledged that his termination had not hindered him in his social associations or in reemployment.

fied position. Minnesota has statutorily enacted a tenure system for its state employees. Under Minn.Stat.Ann. § 43.09 state jobs are categorized as classified and unclassified. Under § 43.21 *classified* personnel are first placed on probation and have the chance to become *permanent* employees. Permanent employees in the classified system may not be removed except for just cause and pursuant to the procedures of § 43.23. The Supreme Court of Minnesota has recently interpreted this statute as conferring a "property" interest on classified employees. *Nyhus v. Civil Service Board,* 305 Minn. 184, 232 N.W.2d 779 (1975). Unclassified employees do not enjoy this kind of job protection.

It is clear that Galaway was not entitled to tenure under the statutory setup and he has presented no evidence of a continued employment interest based on a *de facto* tenure *program* fostered by the state. *Wilderman v. Nelson,* 467 F.2d 1173, 1175 (8th Cir. 1972). Nor was Galaway individually assured by the actions of officials that he would be considered a classified employee or treated like tenured personnel. *But cf. Soni v. Bd. of Trustees of Univ. of Tennessee,* 513 F.2d 347, 350 (6th Cir. 1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976).

In this case the plaintiff bases his claim of a property interest on preemployment discussions he had with members of the Department of Corrections. He alleges that the parties discussed a two-year commitment and that as a result of the discussions, he acquired an oral two-year contract of employment as director.

■ It is clear that officials in the Department, and particularly Milliken who hired Galaway were particularly concerned about the former director's short stay as head of the Minnesota Restitution Center. Milliken in his discussions with Galaway wanted a commitment from him to stay on if they were working well together. Though the testimony of Galaway, Milliken and Schoen is conflicting in several respects, it appears that a two year period was discussed in at least some of the interviews. Because of these conversations when Galaway was hired, he had a reasonable expectation of two years of employment as a nonclassified employee, providing he followed orders and did his job properly. Under the circumstances, the plaintiff was aware of the statutory status of his job, and though the parties anticipated a two-year stay, it was clear to the plaintiff that his job as an unclassified employee was "tenuous," as he has testified. It was also clear to the plaintiff that his job was renewed on a year-by-year basis.

Moreover, despite the fact that Galaway's property interest was *limited* by his awareness of these facts, he was afforded a hearing of sorts before each of the department heads empowered to make a decision in his case. Though he claims he received no notice of the charges, Galaway was aware after the staff's meeting with Lawson that sanctions for refusal to follow an order would follow. Galaway was allowed on several occasions to explain his position to the defendants. No *facts* were in dispute which required the presentation of evidence or the testimony of witnesses. The dispute clearly concerned only Galaway's refusal to follow an order, and each of the parties' positions on that issue were made clear at that time. Galaway was told twice that he would be retained if he followed the order and he was offered reinstatement after termination if he agreed to change his position. Each time he refused.

Each of the plaintiffs' legal positions in this case has been reviewed and the claims he makes have been refuted. Accordingly, the complaint in this case is dismissed. The foregoing memorandum opinion shall constitute the findings of fact and conclusions of law required by the Federal Rules of Civil Procedure.